(No. 45866.▮▮▮▮▮▮▮▮▮▮▮▮

ILLINOIS BELL TELEPHONE COMPANY *et al.,* Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.,* Appellees.

*Opinion filed October 1, 1973.—Rehearing denied Nov. 25, 1973.*

UNDERWOOD, C.J., and WARD, J., took no part.

GORDON W. WINKS, HOWARD J. TRIENENS, and R. EDEN MARTIN, all of Chicago, and LAMBERT M. OCHSENSCHLAGER, of Aurora (REID, OCHSEN-SCHLAGER, MURPHY & HUPP, SIDLEY & AUSTIN, and DONALD H. SHARP, of counsel), for appellant Illinois Bell Telephone Company.

RICHARD L. CURRY, Corporation Counsel, of Chicago (WILLIAM R. QUINLAN, BERNARD RANE, and

MARK GOLDSTEIN, Assistants Corporation Counsel, of counsel), for appellant City of Chicago.

ARAM A. HARTUNIAN, of PRESSMAN & HARTUNIAN, of Chicago, for appellant Independent Voters of Illinois.

ROBERT E. FITZGERALD, JR., of Chicago, for appellant System Council T-4, International Brotherhood of Electrical Workers, AFL-CIO.

WILLIAM J. SCOTT, Attorney General, of Springfield (PETER A. FASSEAS, Special Assistant Attorney General, JAMES R. SULLIVAN and ROBERT H. WIORSKI, Assistant Attorneys General, of counsel), for appellee Illinois Commerce Commission.

ANTHONY R. MARTIN-TRIGONA, *pro se,* appellee.

GEORGE B. PLETSCH, WILLIAM T. HART, HARRY R. BEGLEY, CHARLES A. BANE, and RICHARD G. FERGUSON, all of Chicago (SCHIFF, HARDIN & WAITE, DEFREES & FISKE, and ISHAM, LINCOLN & BEALE, of counsel), for *amici curiae* Illinois Power Company *et al.*

JUSTIN A. STANLEY, ROBERT A. HELMAN, and JOHN N. VANDER VRIES, all of Chicago (MAYER, BROWN & PLATT, and CHAPMAN & CUTLER, of counsel), for *amici curiae* General Telephone Company of Illinois *et al.*

JOSEPH M. WELLS, WAYNE D. JOHNSON, and JAMES HINCHLIFF, all of Chicago, for *amicus curiae* Peoples Gas Light and Coke Company.

DON H. REUBEN, JACK S. LEVIN, JAMES C. MUNSON, STEVEN P. HANDLER, and JOHN R. TEITGEN, all of Chicago (KIRKLAND & ELLIS, of counsel), for *amicus curiae* Arthur Andersen & Co.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Illinois Bell Telephone Company, hereafter called Bell, the City of Chicago, hereafter called the City, System Council T-4 International Brotherhood of Electrical Workers, hereafter called the Union, and Independent Voters of Illinois, hereafter called IVI, filed notices of appeal to the appellate court from the judgment of the circuit court of Kane County affirming the order of the Illinois Commerce Commission fixing rates for Bell. We have allowed Bell's motion, filed under Rule 302(b), and ordered that the appeal be taken directly to this court. Briefs have been filed on behalf of each appellant, on behalf of appellee, Illinois Commerce Commission, hereafter called the Commission, and intervenor-appellee, Anthony R. Martin-Trigona. *Amicus curiae* briefs have been filed on behalf of Central Illinois Light Company, Central Illinois Public Service Company, Commonwealth Edison Company, Illinois Power Company, General Telephone Company of Illinois, Northern Illinois Gas Company, Northern Illinois Water Corporation, United Cities Gas Company, Peoples Gas Light and Coke Company, and Arthur Andersen & Co.

The record shows that on September 23, 1971, Bell filed proposed tariff schedules with the Commission which would increase its annual operating revenues by $182,000,000. The Commission ordered the proposed tariffs suspended, and after extended hearings, granted a general rate increase in the amount of $44,562,000. On appeal the circuit court affirmed the Commission's order.

The record is extremely lengthy, the briefs numerous, the parties have briefed and argued a number of contentions, and therefore the evidence adduced before the Commission, its findings, and the contentions of the parties, will be reviewed only to the extent necessary to the discussion of the issues presented in this appeal.

The Commission found that on December 31, 1971, the original cost of Bell's telephone plant, in service,

devoted to Illinois intrastate operations, was approximately $2,434,393,000, and that the accumulated provision for depreciation was approximately $512,453,000, resulting in a net original cost of $1,921,940,000. It found that the reproduction cost new, less depreciation, of the plant as of December 31, 1971, was $2,578,821,000. It found further that upon consideration of original cost, reproduction cost new, allowances for depreciation, properties held for future use, an appropriate allowance for materials and supplies, construction work in progress, accumulated deferred income taxes, "and by ascribing a weighting factor to its depreciated Original Cost and Reproduction Cost New which is considered fair and reasonable," the "fair value rate base" of Bell's property, "used and useful in its Illinois intrastate operations for rate-making purposes at December 31, 1971, is not less than $2,083,000,000."

The City, admitting that its contention had been rejected by this court in earlier cases, contends that the Commission should not use "fair value" as the rate base, and argues that "original cost" is the proper basis of value. In support of its position it cites numerous authorities which, it argues, demonstrate that original cost provides the proper base for rate calculations and that its use eliminates many of the intricate surveys, appraisals, computations and the application of "weighted" factors which enter into the determination of fair value. It cites recent cases (*Illinois Power Co.*, Ill. C.C. Docket No. 57520; *Peoples Gas Light and Coke Co.*, Ill. C.C. Docket Nos. 57573 and 57946, cons.) in which the Commission, for reasons stated in its orders, abandoned the fair value test and held that the appropriate rate base was original cost.

Bell, in response to the City's contentions, argues that this court has consistently construed section 36 of the Public Utilities Act (Ill. Rev. Stat. 1971, ch. 111 2/3, par. 36) to require the use of fair value rather than original cost, as a rate base, that the City's "policy arguments

against fair value rate-making" are without merit and have been previously rejected by this court, and that the Commission's use of an original cost base in the cases cited by the City is an attempt, on the part of the Commission, "to amend the Act by administrative fiat, in plain defiance of numerous decisions of this court."

The Commission argues that its orders in those cases which it considered subsequent to its decision of this case are not included in the record, are "dehors the record," are not appropriate subjects of judicial notice, and may not, therefore, be considered by this court. Concerning the Commission's contention that this court may not take notice of its actions in proceedings subsequent to the one under review, we are of the opinion that as a tribunal charged with the duty to review the orders of the Commission this court is not required either by constitutional limitation or precedent to perform its judicial functions in a vacuum, and is free to notice those matters which cast light on the issues presented, particularly when, as here, the litigants and numerous *amici* have been given the opportunity to present briefs and argument on the precise question to which the subsequent orders of the Commission relate.

An *amicus curiae* brief filed on behalf of General Telephone Company of Illinois, Northern Illinois Gas Company, Northern Illinois Water Corporation and United Cities Gas Company argues that "No valid basis has been shown for this court to abandon *stare decisis* and reverse its long-standing construction of the Illinois Public Utilities Act requiring the Illinois Commerce Commission to consider reproduction cost in determining the fair value of a utility's property for ratemaking purposes." An *amicus* brief on behalf of the Peoples Gas Light and Coke Company argues that the fair value method "remains as important as ever to sound utility rate-making" and that a utility is entitled to rates based on the present fair value of its property. An *amicus* brief filed on behalf of Central

Illinois Light Company, Central Illinois Public Service Company, Commonwealth Edison Company and Illinois Power Company argues that "Continuance of fair value rate-making is critical to meeting the problem of inflation presently faced by regulated public utilities" and that "Any change from fair value rate-making is a matter for the General Assembly to determine in the public interest." An *amicus* brief filed on behalf of Arthur Andersen & Co., which describes itself as "an auditor for many public utilities," argues that "Original cost is economically meaningless," that its use as the sole measure of rate base "has dire economic consequences," that "the original cost method works only if the rate of return is juggled," and that "current value must be reflected in the utility's rate base."

Since the Commission, in this case, used a fair value rate base, we need not and therefore do not decide whether it was mandated by our earlier opinions to adhere to a fair value base for rate calculation, and concern ourselves only with the issue of whether its refusal, in this case, to adopt the value base for which the City contends requires reversal of its order.

In *Produce Terminal Co. v. Commerce Com., 414 Ill. 582,* in defining the appropriate limits of judicial review of orders of the Commission, the court said: "In reviewing an order of the Commission, the courts are limited to a consideration of the questions of whether the Commission acted within the scope of its authority, whether it made findings in support of its decision, whether the findings and decision have a substantial foundation in the evidence, and whether constitutional rights have been infringed by the decision. The statute does not authorize a court to put itself in the place of the Commission and to determine independently the issues presented, or to substitute its judgment for that of the Commission. (*Illinois Central Railroad Co. v. Franklin County, 387 Ill. 301.*) The law is well settled in this State that the matter of rate regulation is essentially one of legislative control. The fixing of rates

is not a judicial function, thence the right to review the conclusion of the legislature or of an administrative body, acting under authority delegated by the legislature, is so limited. *Public Utilities Com. ex rel. City of Springfield v. Springfield Gas and Electric Co., 291 Ill. 209."* 414 Ill. 582, at 589.

In *Iowa-Illinois Gas and Electric Co. v. Commerce Com., 19 Ill.2d 436, 442-443,* the court said: "This deference to the judgment of the Commission is especially appropriate in the area of fixing rates. Quoting from the *Springfield Gas Co.* case, we said in *Produce Terminal Corp. v. Commerce Com. ex rel. Peoples Gas Light and Coke Co., 414 Ill. 582, 590*: 'A just and reasonable rate, therefore, is necessarily a question of sound business judgment rather than one of legal formula, and must often be tentative, since exact results cannot be foretold. *** Like so many other questions in the law that involve reasonableness of conduct, it is a question of fact to be settled by the good sense of the tribunal it may come before.'

"The power to make rates, of necessity, requires the use of pragmatic adjustments which may be called for by the particular circumstances. (*Federal Power Co. v. Hope Natural Gas Co., 320 U.S. 591, 602, 88 L. Ed. 333, 344; Federal Power Com. v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 86 L. Ed. 1037, 1050.*) This, of course, does not mean that the Commission may ignore pertinent factors affecting the rate structure. In *Illinois Bell Telephone Co. v. Commerce Com., 414 Ill. 275, 286,* we stated the guiding rule for the Commission: 'In the final analysis, the rates fixed by it (in fixing prices as low as possible for the general public purchasing the services) should be sufficient to provide for operating expenses, depreciation, reserves that are necessary in good business judgment and operations and a reasonable return to the investor on the basis of the fair value of the utility property.' "

Upon application of the rules above stated we find

that the Commission's order sets forth adequate findings with respect to its determination of fair value which are supported by substantial evidence, and that this record presents no basis for holding that it erred in its utilization of "fair value" rather than "original cost" as the base for calculating Bell's rates.

We treat next certain contentions of Bell and the City which involve separate and dissimilar items considered by the Commission but with respect to which the review of the Commission's rulings are governed by the same standards. The City contends that the Commission erred in including in Bell's rate base an allowance in the amount of $9,159,000 for materials and supplies. Bell contends that the Commission, in determining the rate base, arbitrarily overstated the depreciation of its property, that it arbitrarily excluded certain property held for future use, arbitrarily refused to include five leasehold interests in the Chicago central business district which, it argues, the Commission "concedes have a substantial value because of the very low rentals required by these leases," and that it improperly refused to include a picturephone plant. Bell contends, too, that in determining fair value "the Commission arbitrarily assigned too little weight to the current cost of the property and too much to the original cost in fixing the rate base."

In *Iowa-Illinois Gas & Electric Co. v. Commerce Com., 19 Ill.2d 436,* at 443, the court said: "We cannot agree that the statutory concept of 'fair value' of property for determining a rate base can be reduced to a mathematical formula. Fair value of the property of vast utilities cannot be resolved by pithy slogans of willing buyers and willing sellers, or the sometimes useful half truth that the worth of a thing is the price it will bring. Fair value must be determined by sound judgment based upon careful examination of data which is oftentimes complex. It is not susceptible of exact determination."

The record shows that the Commission considered

conflicting evidence and the arguments of Bell and the City with respect to whether, by reason of advance billings of its customers and the availability of funds from tax accruals, there should be excluded from the rate base an "average working capital" requirement of approximately $11,000,000 which Bell sought to include, and the allowance for material and supplies which the City argues was improperly included. The Commission order shows that, upon consideration of the testimony and the exhibits, it found that the advance billings and tax accruals provided adequate funds for Bell's monthly average working-capital requirements and excluded that item, and that the amount allowed for material and supplies was reasonable and should be included in determining Bell's fair value rate base. Upon review we cannot say that the findings do not have a "substantial foundation in the evidence." *Produce Terminal Corp. v. Illinois Commerce Com. ex rel. Peoples Gas Light and Coke Co., 414 Ill. 582.*

With respect to Bell's contentions that the Commission arbitrarily overstated the depreciation of its property and improperly excluded the value of certain leaseholds, the record contains a great deal of testimony and a number of exhibits, and shows, too, that in prior rate proceedings the Commission had rejected Bell's arguments concerning the leaseholds. Bell has attacked the sufficiency of those of the Commission's findings with which it disagrees, and we note here that the court has previously held that it is not necessary to make a specific finding as to each evidentiary fact, or each contention (*United Cities Gas Co. v. Illinois Commerce Com., 47 Ill.2d 498*), and that the purpose of specific findings of fact upon the issues is to enable a court to intelligently review the decision of the Commission and determine whether the evidence supports the order entered. (*Chicago & West Towns Rys., Inc. v. Illinois Commerce Com., 397 Ill. 460.*) The Commission's finding which resulted in the increase of the depreciation applied

by approximately $14,000,000 has substantial support in the evidence, and we note, parenthetically, that contrary to Bell's contention, *City of Alton v. Commerce Com., 19 Ill.2d 76,* is not authority for its theory that determination of depreciation by inspection is preferred over accounting computations. We have examined the findings of the Commission with respect to the property held for future use, the leaseholds and the picture plants, and hold that they find substantial support in the evidence. Concerning Bell's contention that "the Commission arbitrarily assigned too little weight to the current cost of the property and too much to the original cost in fixing the rate base" we point out that this is precisely the area of expertise in which this court will not put itself in the place of the Commission (*Produce Terminal Corp. v. Illinois Commerce Com.*), and the exact situation contemplated by the language quoted from *Iowa-Illinois Gas and Electric Co.*

Bell contends next that the Commission erred in fixing the rate of return to be allowed on its fair value base in determining its rates and argues that there are no findings of fact with respect to the rate of return to support the order, that in fixing the rate of return the Commission erred by failing to take into account current economic conditions, that the Commission ignored all inflation after December 31, 1971, and that it arbitrarily ignored "all the credible evidence on the rate of return required on the equity investment." It argues that the Commission is "required by law to allow a rate of return which, tested by present day conditions, is commensurate with returns on investments in other enterprises having corresponding risks" and that its evidence "demonstrates the need for a rate of return of nearly 11% of the fair value of the equity."

Insofar as Bell attacks the adequacy of the findings, we have previously stated, and need not repeat, the purpose of specific findings and the standards which

determine their adequacy. Measured against those standards the findings of which Bell complains are adequate, and we encounter no difficulty in reviewing them.

With respect to its contention that in basing its findings of fair value and in fixing the rate of return on that value as of December 31, 1971, the Commission improperly ignored all inflation after December 31, 1971, Bell argues that its evidence showed conclusively that its operations in 1972 would be less profitable than in 1971; that "a rapidly rising rate base and a declining rate of earnings inevitably reduced the effect of the Commission's allowance below its own minimum rate of return"; that "if the Commission had really allowed the Company a return of 'not less than 7.33%' it would have taken the sharply downward trend of earnings into account in some way in fixing rates to be charged for the future. *** Its failure to make any kind of allowance for the continued inflationary trends in 1972 and 1973 was a serious error and was wholly inconsistent with current economic conditions." It argues that in *Iowa-Illinois Gas and Electric Co. v. Illinois Commerce Com., 19 Ill.2d 436,* the Commission considered trends in the current year, and that "it is obviously unfair for the Commission to look ahead when it believes that earnings are on an upward trend, and to refuse to do the same thing when the unchallenged proof shows that earnings are being reduced by inflation." It contends, too, that in the case of *Commonwealth Edison Co.,* Ill. C.C. Docket No. 56247, the Commission authorized in advance a rate to become effective in 1973, upon confirmation of the utility's estimates for the year 1972, and argues that it had specifically requested such partial relief but that its request was denied "without any explanation of why it should be available to Commonwealth Edison and not to us." Concerning this issue IVI contends that the rate base is erroneously inflated for the reason that the Commission made its determination of fair value for the rate base as of the year-end, 1971, that the revenues and expense which

the Commission considered were those of the calendar year, that Bell's property used in intrastate operations was increased by approximately $154,000,000 between January 1, 1971, and December 31, 1971, and that "by taking into account only one day of the year instead of the entire year, an unrealistic and artificially high rate base was employed in the calculation."

In its order the Commission discussed the contentions of the parties concerning the use of a "future test year" and reviewed briefly that portion of its order in *Commonwealth Edison Co.,* Ill. C.C. Docket No. 56247, to which Bell refers in its brief. The Commission stated that it had found that "under the peculiar facts of that case a future increase might be required" and had approved "an additional increase in rates based on a projected test year, subject, however, to the requirement that before such increased rates would become effective, estimated financial data upon which said rates were based would have to be confirmed by actual financial data for said period." The Commission went on to say that in this case it did not find any circumstances "to compel it to depart from its established policy of basing its considerations" on actual rather than estimated financial data.

An examination of the authorities and the treatises shows that there is substantial disagreement and a wide divergence of views among the regulatory agencies concerning the proper "test year" to be used in fixing rates, whether only confirmed financial data should be considered or whether estimates for future periods are to be taken into consideration, and, if future periods are to be considered, the length of the projected period which is "reasonable" and will not be deemed "remote." In its brief the Commission argues that the expenses, revenues and investments of an operating utility "are nearly always in a dynamic state" and, citing authority, contends that while some elements of cost increase, others remain constant, and that increases in costs and revenues are frequently

offsetting. Upon consideration of the record, the conflicting positions taken by the parties, and the authorities, we conclude that the decision of the Commission on this matter falls within the scope of the "sound business judgment" and "pragmatic adjustments" to which the court referred in *Iowa-Illinois Gas and Electric Co.*, that the findings of the Commission have a substantial foundation in the evidence, and that its decision to apply the 1971 test year and the December 31, 1971, valuation date was not erroneous.

In support of its contention that the Commission failed to allow it a proper rate of return on its equity investment, Bell argues that the testimony of its expert witnesses and the "credible portions" of the testimony of Dr. J. K. Langum, who appeared as an expert witness on behalf of the Department of General Services of the State of Illinois, demonstrate its need for a rate of return of "nearly 11% on the fair value of the equity." W. A. Morton, an expert called by Bell, testified concerning the earnings on "common book equity" of 125 electric utilities, 425 "industrials," and American Telephone & Telegraph (hereafter AT&T), Bell's parent company, and stated that in his opinion Bell required a rate of 10.83% on "Adjusted equity cost for use with a fair value rate base" and that the fair rate of return applicable to the fair value rate base was 8.5 to 8.6%. E. Peske, vice-president and treasurer of Bell, testified that the "weighted cost of equity" is 6.41 to 6.94% and that the "required on book cost becomes 9.2% to 9.7%." His testimony shows, too, that the fair value rate base used by the Commission was approximately 115% of "net original costs." J. H. Wills, a banker, called by Bell, testified that the debt ratio of the Bell System (AT&T) "shot up" from 35.4% to 44.9% in three years and that in his opinion "to maintain the confidence of investors in the high quality of Bell System bonds as well as in terms of prudent financial management this trend should be reversed." He projected AT&T's

necessary rate of return on total capital to be 9.6%. The exhibits supporting the testimony of Morton and Wills, as did their testimony, related almost entirely to AT&T and the "Bell System" with only occasional reference to the company involved in this proceeding. Peske testified that:

"Illinois Bell has the same rate of return requirement as the Bell System because its equity capital is obtained almost exclusively from AT&T and its debt is viewed by investors in the context of total Bell System debt.

In the debt market, knowing that AT&T credit is involved in each associated company, investors also follow and appraise the Bell System's debt ratio and interest coverage, not solely Illinois Bell's. They set their portfolio objectives in terms of total Bell System debt, not individual companies within the Bell System. Therefore, each Bell company comes to the bond market on a prearranged schedule designed, insofar as possible, to avoid competing with one another for the investors' dollars.

Unlike selling debt, raising new equity capital is almost exclusively the task of AT&T. Only 2/3 of one percent of Illinois Bell common stock is held by the public; the rest is owned by AT&T. Illinois Bell is dependent upon AT&T for new equity capital which means that our ability to sell new shares ultimately rests on AT&T's ability to sell new shares of common stock to the public. And one of the important factors which investors take into account in their decision whether to buy AT&T or not is the Bell System debt ratio. Since this debt ratio is bound up in the cost of equity, it is only reasonable that it be used in determining the appropriate rate of return.

In the final analysis, Illinois Bell's ability to obtain new equity capital depends upon AT&T's ability to sell new shares. If Illinois Bell paid out all its earnings or none of its earnings, this fact would not change."

In contrast to that of the Bell witnesses, the testimony of Dr. Langum, and the supporting exhibits, related directly to Bell, the company involved in this proceeding. He testified that in his opinion a fair rate of return on the book value of common equity of Bell "is no less than

9.50%" and his exhibit 2 shows that a fair rate of return for Bell, applied to a fair value rate base of $2,074,127,750 was "no less than 7.33%."

The portion of the Commission's order which considered and decided the rate of return to be allowed Bell contains a detailed discussion of the evidence and a careful comparison of the conflicting opinions of the expert witnesses whose testimony we have reviewed. Upon review of this portion of the order, and application of the rules enunciated in *Produce Terminal Corp.* and *Iowa-Illinois Gas and Electric Co.,* we cannot say that the Commission's finding that a rate of return of not less than 7.33% on Bell's fair value rate base is erroneous or that it does not find substantial support in the evidence.

We consider next the contentions of the parties concerning the Commission's allowances to Bell of certain operating expenses. It is the position of the City and IVI that the Commission erred in allowing excessive amounts expended for advertising and public relations, and charitable contributions, to be treated as operating expenses. In addition, IVI attacks the propriety of recognizing as operating expense Bell's licensing fees paid to AT&T, which owns 99.3% of Bell's outstanding stock, its expenditures for "lobbying," and its payment of the dues to civic, social and athletic clubs of certain of its executives. It also challenges the correctness of permitting Bell to treat as operating expenses the full cost of its purchases from Western Electric, and certain purchases of gasoline.

We consider first Bell's expenditures for advertising and public relations. The City argues that it has no quarrel with Bell's expenditures for "informative" as distinguished from "promotional" advertising. It cites the testimony of James G. Phillips of the Commission's staff that "in the opinion of the staff" one half of Bell's advertising expenditures could be discontinued "without any material effect on operating revenues." IVI argues that "a company without competitors is hard put to justify charging its customers for advertising expense." It called an expert

witness who testified that the type of advertising done by Bell "doubles the cost per customer exposed." It is Bell's position that a reduction in advertising would injure service and reduce its net earnings. The Commission, in discussing the question, noted that Bell had adduced considerable testimony relevant to its advertising and public-relations programs, and then said:

> "The Company's expense in relation to the above has not been excessive nor should it be deemed improper. However, in today's economic climate involving inflationary spiraling of costs which the utilities cannot avoid and still provide adequate service to the public, it becomes apparent to the regulatory agencies that the Company's operating expenses should be closely scrutinized and that those which do not specifically relate to business operations be excluded for rate-making purposes in the determination of the Company's Operating Income.
>
> This observation was also made in a recent expression of policy on advertising of the New York Public Service Commission made public July 10, 1972, where it was stated that since management can control its advertising expenditures,
>
>> 'it is not in the interest of anyone to have unnecessary institutional advertising exacerbate customer resentments at a time when large rate increases are made necessary by increases in the various classes of costs beyond the control of utility management.'
>
> It would appear to be sound business judgment that the 'belt-tightening process' should begin in those areas not directly and totally related to the providing of the utility service to the public."

After this admonition that such expenditures would be carefully scrutinized in the future the Commission then found that Bell's expenditures had not been excessive or improper, and from our review of the record we cannot say that its findings are without sufficient support in the evidence.

With respect to lobbying expense, Bell states in its brief that it has three employees "who spend part of their time discussing proposed laws with members of the

legislature." It studies all bills and "in a small number of cases openly informs the sponsors and other members of any facts which might affect the wisdom of those proposals as applied to our specialized business." It concludes its argument with the statement that "IVI's attempt to stop this very limited effort infringes on free speech and our right to petition the legislature."

The issue presented is not Bell's freedom to exercise its right of free speech but whether it may do so at the ratepayers' expense. Admittedly there is some conflict in the decisions of other jurisdictions, but we conclude that Bell's customers, who are not given an opportunity either to advocate or decide which legislative proposals should be supported, should not bear the cost of lobbying, and that such expenditures should be excluded from the operating expenses which are to be taken into consideration in fixing rates.

An exhibit shows that Bell contributed approximately $591,000 to Community Chests and United Funds, $95,000 to hospitals, $24,200 to YMCA and YWCA's, almost $11,000 to Junior Achievement and various sums to a number of welfare, educational and health agencies for an overall total of $1,125,384.83. It paid the dues of certain of its executives to civic, social and athletic clubs in the total amount of $28,531.12. The Commission, in its order, stated, "The general trend has been to allow membership dues in Chambers of Commerce, trade associations and industry organizations, but to disallow dues paid to civic service organizations, social and athletic clubs," but the Commission made no further findings with respect to these item. Bell argues that the charitable contributions are proper and "meet the requirements" of *Peoples Gas Light and Coke Co. v. Slattery, 373 Ill. 31,* which held that donations are not a proper operating expense unless it is shown that they will be of some peculiar benefit to the company or its patron. In its order the Commission referred to *Virtjak v. Illinois Bell Telephone Co.,* Ill. C.C.

Docket No. 46221, in which, in *dicta,* it said that "contributions which were reasonable in amount and the benefits to the public apparent" may be deemed proper and allowable operating expenses. Recognizing that a conflict exists (see *Pacific Telephone & Telegraph Co. v. Public Utilities Com., 62 Cal. 2d 634, 44 Cal. Rptr. 1, 401 P.2d 353,* and *New England Telephone and Telegraph Co. v. Department of Public Utilities (Mass.), 275 N.E.2d 493),* we conclude that the allowance of such contributions as operating expenses for purposes of ratemaking constitutes an involuntary assessment on the utility's patrons, and we question the propriety of Bell's being permitted to thus dispense largesse at their expense. We hold, therefore, that such expenditures are not operating expenses cognizable for the purposes of ratemaking. Concerning the expenditures for dues, again recognizing the split in the authorities, we conclude that the better rule is to disallow such expenditures and hold that expenditures for dues to civic, social and athletic clubs are not operating expenses to be considered in the fixing of rates.

We consider next the contentions of the parties with respect to the payment by Bell to AT&T of an annual licensing fee. In the test year of 1971 the payment to AT&T was $7,979,000, 1% of Bell's gross revenues. IVI argues that the expenditure is not a properly allowable operating expense unless it relates to Bell's customer services or benefit and that much of the license fee is used for purposes which have no relationship to Bell's services or business, and that some of the funds are allocated by AT&T to expenses which would be disallowed if the expenditures were made by Bell. Bell argues that under its contract with its parent company, entered into in 1930 and amended in 1948, AT&T is required to furnish it a number of valuable services including the research of its laboratories, free use of a number of important patents and "operating and financial advice and assistance from the headquarters staff." An exhibit, introduced into

evidence by Bell, shows that AT&T received from Bell in 1970 the sum of $7,046,549 and allocated as net expenditures relating to Bell's intrastate operations $7,596,851. Bell argues that "Most of the items to which IVI objects are the cost of servicing AT&T securities and maintaining its corporate organization and existence. If AT&T did not exist, it obviously could not render any of these valuable services. By selling its own securities and investing part of the proceeds in Illinois Bell stock, AT&T greatly reduces Illinois Bell's own cost of servicing the Illinois Bell securities. For example, we would have to issue many thousands of dividend checks and stock certificates if AT&T did not pay these expenses. Most states have accepted these AT&T costs as proper."

In its order the Commission, albeit not explicitly, appears to adopt Bell's position, and in its brief in this court it argues that the evidence supports the conclusion that the license fee is a proper expense.

We have considered the contentions of the parties, the testimony, the exhibits, and the authorities, and conclude that it is improper to permit Bell to include in its operating expenses for rate-making purposes a license fee to AT&T based on a percentage of revenues, and that the amount of the payment of the license fee must be directly related to, and include only, such expenditures as would be permissible if made by Bell. Included in the sums allocated by AT&T to its costs related to Bell's intrastate operations are expenditures for charitable contributions, civic, social and athletic club dues and lobbying which we have specifically held not includable in operating expenses. Bell's testimony concerning the rate of return stressed the identity of interest of Bell and AT&T, and indeed most of its testimony related to AT&T's requirements rather than Bell's. Although not specifically identifiable in the exhibits on file, it is obvious that AT&T incurred expenses occasioned by its holding-company activities and relating directly to its position as an investor in Bell, and Bell's

ratepayers should not be required to pay any part of this cost unless it can be shown to directly benefit them or the services which Bell renders.

IVI contends that because Western Electric and Bell are both subsidiaries of and dominated by AT&T, Bell should not be permitted to include as operating expenses any sums paid to Western in excess of the amount required to give Western the same 7.33% rate of return allowed Bell. It argues that AT&T, "through the corporate device of the Western Electric Company" realizes a profit from its sale to Bell which in turn capitalizes the purchases, or charges them to operating expense, "thus subjecting Bell's rate payer to the burden of paying a profit on a profit." It is Bell's position that the evidence shows that Western's prices and profits are lower than any comparable source of the equipment it manufacturers. An exhibit introduced by Bell shows that Western's rate of return on "Bell business" (presumably the Bell System) was 10.4% in 1970 and for the period 1925 through 1970 was 9.1%. In its order the Commission made a finding on this issue only insofar as it relates to the inclusion of equipment in the rate base at Bell's cost of purchase from Western, and does not decide the question of the appropriate figure to be used in computing operating expenses. In its brief filed in this court, the Commission in effect endorses Bell's position and cites cases which in our opinion are wholly irrelevant to the issue.

The record shows that AT&T owns 99.3% of the shares of Bell and 100% of the shares of Western. As previously noted, Bell's testimony concerning its financial structure and requirements for a reasonable rate of return show it to be virtually inseparable from AT&T, and we deem it improper to permit AT&T, through sales by Western to Bell, to earn 10.4% on that portion of its operations when the Commission has found 7.33% to be the appropriate rate of return. In our opinion, to do so imposes on Bell's patrons the burden of providing to

AT&T, through the device described, an excessive return on the sales by Western to Bell, and we hold that it was error to recognize with respect to both the fair value rate base, and operating expenses, any sums paid by Bell to Western which would yield Western a return in excess of 7.33%.

We consider next the contention of IVI that Bell could have saved $109,000 through the bulk purchase of gasoline in the Chicago area and that the Commission erred in allowing as an operating expense the full amount of its expenditures. Bell argues that it purchases gasoline at retail in the Chicago area to avoid "sizable costs and dangers" which would be involved in bulk storage of gasoline in congested areas. We have examined the testimony and upon consideration of the contentions of the parties conclude that the Commission did not err in allowing these expenditures as operating expenses.

We consider next the issues raised by the appellant Union. In the hearings before the Commission the Union introduced evidence that showed that Bell paid employees who performed work in the same job category wage rates which varied from city to city in which Bell operates, and that its wage schedules are set up according to "town classifications." On cross-examination a Bell witness testified that it was "company policy" to pay the market price of labor in the locality and that on occasion supervisory personnel were sent to other areas to work for other Bell affiliates whose employees were on strike. The Union contends that section 8 of the Public Utilities Act provides "the clearest form of delegation of authority to the Commission to oversee the operations of the utility, including its management decisions relative to its employees" and that the discriminatory practices of which it complains are violative of section 38 of the Act. It argues that the Commission improperly refused to consider its contentions, that it erred in failing to make findings on the

issues presented by its evidence and asks that this court "find that the Illinois Commerce Commission should have included in its order below a ruling that the Company abused its discretion regarding its personnel policies."

Bell contends that the Commission is without jurisdiction to consider the Union's demands, which, it argues, "are not properly part of the case at bar" and are "contrary to the evidence." It is the position of the Commission that under section 8 of the Public Utilities Act it does not have jurisdiction over wage-rate discrimination or "strike breaking" and that "by the enactment of Subchapter II of the National Labor Relations Act the Federal government pre-empted exclusive jurisdiction over the controversies in the industrial field that affect interstate commerce."

The facilities of a telephone system which are an integral part of the national network of telephone lines affect interstate commerce within the contemplation of the National Labor Relations Act (29 U.S.C. sec. 151 *et seq.*) (*National Labor Relations Board v. J. F. Boswell Co. (9th Cir.), 136 F.2d 585*), and the National Labor Relations Board has consistently exercised jurisdiction over the telephone industry. (*La Crosse Telephone Corp. v. Wisconsin Employment Relations Board, 336 U.S. 18, 93 L. Ed. 463, 69 S. Ct. 379.*) Under these circumstances, we do not find it necessary to decide whether the provisions of sections 8 and 38 of the Public Utilities Act confer upon the Commission the power to inquire into and regulate the matters with which the Union is here concerned, nor need we concern ourselves with the question of whether the Federal government has pre-empted exclusive jurisdiction in this area. The decision of the Commission on this subject must be reviewed by the same standards as are its other orders (see *Produce Terminal Corp. v. Illinois Commerce Com.*), and in the absence of substantial evidence that action by the Commis-

sion is necessary to the proper exercise of its supervisory authority we cannot say that it is required to assert jurisdiction or make further inquiry into the matter.

As previously noted, a brief was filed on behalf of Anthony R. Martin-Trigona, intervenor-appellee, appearing *pro se.* We have examined the brief and find nothing therein which requires further discussion.

For the reasons stated, the judgment of the circuit court of Kane County is reversed and the cause is remanded with directions to remand to the Illinois Commerce Commission for further proceedings consistent with this opinion.

*Reversed and remanded,*
*with directions.*

MR. CHIEF JUSTICE UNDERWOOD and MR. JUSTICE WARD took no part in the consideration or decision of this case.