UNITED CITIES GAS COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, Respondent.

Fourth District   No. 4—91—0070

Opinion filed January 31, 1992.

Daniel J. Kucera and Frank A. Mraz, both of Chapman & Cutler, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (David L. Nixon, Special Assistant Attorney General, of Chicago, of counsel), for respondent.

JUSTICE STEIGMANN delivered the opinion of the court:

United Cities Gas Company (United Cities) appeals an order of the Illinois Commerce Commission (ICC) entered in a rate case (*United Cities Gas Co.* (Nov. 19, 1990), Ill. Com. Comm'n Nos. 90—0008, 90—0152), contending (1) costs allegedly associated with the acquisition of another gas utility were improperly excluded from its rate base and

from its operating expenses for the rate case test year, and (2) its allowed rate of return is inadequate. We reverse and remand for further proceedings.

## I. Costs Of Consulting And Noncompeting Agreement

On December 21, 1989, United Cities filed new tariffs with the ICC proposing a general rate increase for its Illinois customers. Among the factors which entered into United Cities' determination of its proposed new rates was a payment of $5.7 million which it had made concurrently with its acquisition of Union Gas in exchange for a consulting and noncompete agreement. Under this agreement, Union Gas' former owners agreed to provide consulting services to United Cities and entered into a covenant not to compete against United Cities. United Cities recorded the amount which it paid pursuant to this agreement as a deferred debit and proposed to amortize the expenses of the agreement attributable to Illinois over a 10-year period corresponding to the term of the agreement.

The ICC staff excepted to United Cities being allowed to recover the costs of this agreement from its ratepayers.

At the ICC hearing on United Cities' request for increased rates, Richard K. Wrench, United Cities' assistant director of regulatory affairs, testified that the consulting and noncompete agreement was an integral part of United Cities' acquisition of Union Gas, and that the result of the acquisition of Union Gas, including placement of the unamortized costs of the consulting and noncompete agreement in United Cities' rate base, was a reduction in United Cities' Illinois revenue requirements of $213,200. In his surrebuttal testimony, Wrench stated that because the former owners of Union Gas are active in the business in which United Cities operates, as well as in direct sales of natural gas on the spot market, United Cities deemed it imperative to obtain a consulting and noncompete agreement which placed these persons in a supportive rather than an adversarial position.

Wrench testified that United Cities' Illinois customers benefit as a result of the consulting and noncompete agreement because of the supportive role in which it places the former owners of Union Gas. Wrench further stated the following with regard to the effect of United Cities' acquisition of Union Gas on United Cities' Illinois rate ratepayers:

> "There is a cost reduction due to the allocation of certain common expenses to Kansas which were previously borne by other jurisdictions, including Illinois. In this instant case, this

amounted to $296,697. The prorated expense of [the consulting and noncompete] agreement of $124,122 netted against this benefit results in an ongoing benefit to the customers of Illinois amounting to $172,575. The agreement's cost will run out in ten (10) years, however, the benefit of sharing of costs will accrue. to the Illinois customers way beyond the ten (10) years, if not forever."

Steven Knepler, of the accounting department of the ICC's research and standards section, testified that the cost of the consulting and noncompete agreement (1) should be included in account number 114, gas plant acquisition adjustment, and (2) amortized annually to nonoperating income in account number 425, miscellaneous amortization, over a period not to exceed the agreement's life.

On cross-examination by United Cities' counsel, Knepler stated he understood that United Cities' acquisition of Union Gas would not have taken place absent the consulting and noncompete agreement. Knepler agreed that after considering the cost of the agreement, United Cities' acquisition of Union Gas resulted in a benefit in excess of $170,000. Knepler stated, however:

"A. [Knepler:] The benefits from the noncompete agreement come from the allocation process [(allocating fixed costs to a larger number of customers)] and not the noncompete agreement per se for the Illinois ratepayers.

\* \* \*

The noncompete agreement does not add any value to the service to the Illinois ratepayer. It does not enhance the quality of service."

Knepler acknowledged, though, that the benefits of the acquisition of Union Gas "go hand in hand" with the agreement.

The hearing examiner noted that there was testimony on United Cities' behalf which established (1) that the company's management believed it imperative to place the former owners of Union Gas in a supportive rather than an adversarial position, and (2) that the agreement was an integral part of United Cities' acquisition of Union Gas, which would not have taken place without it. On this basis, the hearing examiner concluded that the evidence established that the consulting and noncompete agreement benefitted Illinois ratepayers and that the unamortized cost of this agreement was thus properly included in United Cities' rate base.

In an order which addressed exceptions to the hearing examiner's proposed order, the ICC incorporated the following two paragraphs from the hearing examiner's recommended order:

"On rebuttal, Mr. Knepler accepted the Company's rebuttal and surrebuttal evidence showing that the acquisition of Union Gas would not have taken place without the [consulting and noncompete] Agreement and that the acquisition benefits customer [*sic*] in Illinois through the reallocation of various general corporate and common expenses over the broader base after the merger. Respondent's Exhibit [No.] S-5 shows that the merger has caused a reduction in annual allocated expenses to Illinois customers of $320,160 and the annual cost of the Agreement to Illinois ratepayers is $124,122 resulting in the net savings of $196,038 to Illinois ratepayers. Mr. Knepler also acknowledged that the acquisition of Union Gas has enhanced Respondent's credit standing. On surrebuttal, Mr. Wrench testified that the Company's recent Series Q First Mortgage Bonds were issued at 130 basis points over 30 year Treasury Bonds, or 9.75%. This compares to its previous issues in the market place at 165 basis points over Treasury Bonds.

On surrebuttal, Mr. Wrench testified that the former owners of Union Gas are financiers and entrepreneurs located in New York City who have a multitude of diversified investments including some in the natural gas and utility businesses including indirect sales of natural gas on the spot market. He stated that [United Cities' senior management] and Board of Directors believed it to be imperative to place these individuals in a supportive rather than in an adversarial position. Mr. Wrench testified that the Agreement was an integral part of the acquisition which would not have taken place without it."

However, the ICC rejected the hearing examiner's determination that the unamortized cost of the consulting and noncompete agreement should be included in United Cities' rate base. The ICC's statement of reasons for this decision reads in its entirety as follows:

"After reviewing the record on this issue, the Commission determines that Staff has justified its proposed adjustment to deny [United Cities'] request for regulatory treatment [inclusion in its rate base of the costs of] the Consulting and Non-Compete Agreement. The evidence establishes that it is the acquisition [of Union Gas], and not the Agreement, which has resulted in benefits to Illinois ratepayers. While Staff has accepted the Company's position that the acquisition of Union Gas would not have occurred without the Agreement, the Company has failed to show how the cost of the Consulting and Non-Compete Agreement benefits Illinois ratepayers. Further,

nothing in the record helps us to determine what percentage of the $5,740,000 is for consulting fees and what percentage is for the Non-Compete Agreement. Finally, the record is insufficient to determine whether the 10-year Consulting and Non-Compete Agreement will benefit Illinois ratepayers. We, therefore, conclude that these costs should not be placed in rate base."

Disagreeing in a concurring opinion, Commissioner Manshio eventually concluded that there is, for practical purposes, no distinction between United Cities' acquisition of Union Gas and the consulting and noncompete agreement. Commissioner Manshio noted that evidence presented by United Cities established that the agreement was an integral part of the acquisition which would not have occurred without it, and that the ICC staff had agreed with this conclusion. Commissioner Manshio stated that the agreement had value because it enabled United Cities to acquire Union Gas, which resulted in a net annual savings to Illinois ratepayers of $196,000. Also, Commissioner Manshio observed that the agreement (1) protected the integrity of United Cities' service areas and (2) improved its credit rating, which reduced its debt costs.

United Cities argues the ICC erred in not permitting inclusion of (1) the unamortized cost allocable to Illinois of its consulting and noncompete agreement with the former owners of Union Gas in its rate base, and (2) one-tenth of the cost of this agreement in its operating expenses for the rate case test year. United Cities contends that this agreement was inseparable from its acquisition of Union Gas and resulted in a $124,122 net benefit or reduction in costs to its Illinois ratepayers. United Cities argues that this agreement also benefitted its Illinois ratepayers by (1) improving its credit rating and consequently reducing its cost of capital and (2) protecting its Illinois service areas from ruinous competition and loss of customers. United Cities concludes that the ICC's resolution of this issue conferred upon its Illinois customers all the benefits flowing from the agreement without permitting United Cities to recover any of the resulting costs. For these reasons, United Cities contends that the ICC's failure to permit it to recover the costs of the consulting and noncompete agreement allocable to Illinois is arbitrary, confiscatory, and contrary to the manifest weight of the evidence.

The ICC contends that it properly excluded the costs of the consulting and noncompete agreement from United Cities' rate base because the costs of this agreement did not meet the test of being reasonable, related to utility expenses, and of benefit to ratepayers or utility service. The ICC states that the agreement provides only that

unknown services may be rendered to United Cities at some point in the future, and the record does not establish that United Cities needed such an agreement.

In determining whether the ICC acted properly in refusing to allow United Cities to recover the costs of the consulting and noncompete agreement in its rates, we are mindful of the principle that the findings of the ICC are *prima facie* true and correct and cannot be set aside on appeal unless clearly contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—201(d).) Moreover, ICC decisions are "entitled to great weight as being the judgment of a tribunal appointed by law and informed by experience." (*Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523, 169 N.E.2d 329, 332.) In reviewing ICC decisions, we are limited to determining whether (1) the ICC's decision was within the scope of its statutory authority, (2) the ICC made findings adequate to support its decision, (3) the findings have substantial evidentiary support in the record, and (4) the ICC's decision infringed upon constitutional rights. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 469, 303 N.E.2d 364, 369.

Deference to the judgment of the ICC is particularly appropriate in the area of fixing rates. (*Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n* (1960), 19 Ill. 2d 436, 442, 167 N.E.2d 414, 417.) Courts generally accord great respect to the expertise of the ICC in this area. (*Cerro Copper Products v. Illinois Commerce Comm'n* (1980), 83 Ill. 2d 364, 370-71, 415 N.E.2d 345, 348-49.) We nevertheless conclude that this is one of those very rare cases in which the ICC's findings are clearly contrary to the manifest weight of the evidence.

The ICC's conclusion that there is nothing which establishes that the cost of the consulting and noncompete agreement confers benefits on United Cities' Illinois ratepayers is belied by the evidence that the agreement was an integral part of the acquisition of Union Gas, and that the acquisition would not have occurred absent such an agreement. Thus, the consulting and noncompete agreement benefitted United Cities' Illinois ratepayers to the same extent as the other terms and conditions of the acquisition of which it was an essential part.

Steven Knepler's testimony that the consulting and noncompete agreement does not add anything to the value of service to United Cities' Illinois ratepayers also does not support disallowance of the cost of the consulting and noncompete agreement. The entire acquisition transaction, which encompassed the consulting and noncompete

agreement as one of its integral parts, resulted in significant cost savings to United Cities' Illinois ratepayers. In determining the costs of acquiring Union Gas that United Cities may recover in the rates it charges its customers for natural gas service, the cost of the consulting and noncompete agreement cannot be separated from the other amounts which United Cities expended to acquire Union Gas.

The cases on which ICC principally relies to support its position as to this issue are inapposite. In *Illinois Bell Telephone Co.* (55 Ill. 2d at 478-81, 303 N.E.2d at 373-76), the court held that the ICC properly denied a utility recovery through its rates of monies expended for lobbying, charitable contributions, civic and social club dues, and unnecessarily high licensing fees paid to an affiliated company. Similarly, in *Du Page Utility Co. v. Illinois Commerce Comm'n* (1971), 47 Ill. 2d 550, 560-61, 267 N.E.2d 662, 667-68, the court ruled that the ICC properly disallowed recovery in rates of one-half the amount of excessive salaries paid to the officers of a public utility. Here, by contrast, the disputed expenditure is a legitimate cost of the acquisition of another utility.

The cost of the consulting and noncompete agreement was an integral part of the cost of United Cities' acquisition of Union Gas. Because the amount which United Cities expended to secure this agreement is a legitimately incurred cost of service which it is entitled to recover in its rates (*Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1953), 414 Ill. 275, 286, 111 N.E.2d 329, 335), the portion of the ICC's decision which denies recovery of this cost is contrary to the manifest weight of the evidence. We therefore reverse this portion of the ICC's decision.

## II. SECURITIES ISSUANCE EXPENSES

United Cities also challenges the portion of the ICC's order which establishes the rate of returns on capital to which it is entitled. United Cities suggests that the ICC may have improperly disregarded expenses attributable to the issuance of new securities—"flotation costs"—in determining its permissible rate of return.

Scott Rungren, a financial analyst with the financial analysis section of the ICC's finance department, testified as follows concerning the inclusion of flotation costs in United Cities' rate of return on equity:

> "The Company had an equity issuance in May[ ] 1989 for which it has yet to receive compensation. The total cost related to this issuance was $716,177. The Company also has an equity issuance planned for April, 1991, for which the issuance cost is

expected to be $862,500. The total issuance costs for these two issuances is $1,578,677. Based on a five-year amortization which results in a $315,735 average annual issuance expense, and a 0.0657 allocation factor attributed to the Illinois jurisdiction, the appropriate issuance expense adjustment [to the permissible rate of return on common equity] is 0.42%, or 42 basis points.

\*\*\*

The addition of the issuance expense adjustment results in a cost of common equity range of 13.62% to 14.22%. I recommend the midpoint of this range, 13.92%, for the authorized rate of return on common equity for [United Cities]."

Rungren further testified that (1) a thorough cost of common equity analysis requires application of appropriate financial models as well as the analyst's informed judgment, and (2) a cost of equity recommendation based solely on judgment is inappropriate, as is the mechanistic application of financial models.

Dr. Donald A. Murray, an economist who testified on behalf of United Cities, stated on cross-examination that the proposed equity issuance to which part of the flotation costs here at issue related was previously scheduled for the fall of 1990 but had been delayed until the spring of 1991.

United Cities accepted the testimony of Rungren concerning its cost of capital, and the hearing examiner relied on Rungren's testimony in assessing United Cities' cost of capital. The hearing examiner concluded United Cities' rates should be based on the following costs for various categories of capital:

| PERCENTAGE OF TOTAL CAPITAL | TYPE OF CAPITAL | COST | WEIGHTED COST |
|---|---|---|---|
| 45.7 % | long-term debt | 10.19% | 0.92% |
| 8.9 % | short-term debt | 10.34% | 4.66% |
| 0.15% | preferred stock | 7.1 % | 0.01% |
| 45.25% | common equity (stock) | 13.92% | 6.30% |
| TOTAL 100.00% | | | 11.89% |

In that portion of its order concerning United Cities' cost of capital, the ICC incorporated the relevant findings and summary of the evidence which were contained in the hearing examiner's proposed order. The ICC adopted the hearing examiner's determinations with regard to the costs of all classes of capital, with the exception of com-

mon equity. The ICC revised the cost of common equity to 13.62% (from 13.92%), which yielded a total weighted cost of capital of 11.75%, instead of 11.89% as stated in the hearing examiner's proposed order. As its basis for this departure from the hearing examiner's recommendation, the ICC stated the following:

"The Commission accepts Mr. Rungren's analysis for the purpose of establishing a range within which the selection of an allowed rate of return on equity for Respondent would be reasonable. Determination of the actual allowed return on equity within the established range of reasonableness always involves elements of judgment, based upon the unique facts and circumstances of each case. In this case, the Commission has accepted a 42 basis point upward adjustment to the recommended equity return range due to flotation costs, although some of those costs are attributed to an equity issue that will not occur until April of 1991, at the earliest. The Commission notes, however, that the Respondent will begin charging rates to recover these costs shortly after issuance of this order. In addition, although the evidence indicated that some equity issuance is likely, there remains some uncertainty concerning the exact timing and amount of the equity issuance due to market and other conditions which may exist at the time of the planned issuance. Yet, ratepayers will continue to pay rates which reflect these flotation costs regardless of when the issuance actually occurs. After review of the entire record, therefore, the Commission is of the opinion that a proper balancing of the interest of ratepayers and shareholders indicates that the allowed return on equity should be established at the lower end of the range on [sic] reasonableness established by Mr. Rungren."

In his concurring opinion, Commissioner Manshio further opined that the ICC's reduction of United Cities' allowable rate of return on equity from the rate stated in the hearing examiner's proposed order was tantamount to denying United Cities an opportunity to recover securities issuance expenses. Commissioner Manshio noted that United Cities had issued equity securities in May 1989 as to which it had not yet received compensation for flotation costs, and that the majority's order ignored this. At the conclusion of his concurring opinion, Commissioner Manshio stated:

"On a practical level, [United Cities] and Staff agreed to the midpoint of Staff's analysis. This agreement, however, is subject to the Commission's review and approval. The exercise of review and approval should be based upon substantive analysis

rather than perceived expertise. If the Commission disagrees with flotation costs, but allows them and then goes to the low end of the range because they were used, what message is sent? I submit a mixed one at best. Is the Commission penalizing the use of flotation costs? Is the Commission saying that a utility must not only be prepared to articulate its rationale for accepting an agreement [as to a rate of return], but also have a fully supported alternative in case the Commission rejects the uncontested argument? What is our standard of moving within the range of reasonableness, pure discretion? This exercise of discretion will have consequences on the willingness of parties to settle issues, on the scope of briefs, and whether courts will defer to the assumed expertise of an administrative agency."

State public utility commissions have not accorded a uniform treatment to security flotation costs. Some commissions hold that such costs are chargeable to a utility's stockholders, while others include them in the expenses recoverable from ratepayers. (See C.F. Phillips, Jr., The Regulation of Public Utilities 354-55 (1984).) In this case, however, it is clear from the language of the ICC's order that the ICC accepts the general principle of permitting utilities to recover flotation costs as a component of the permitted rate of return on equity. The ICC apparently awarded United Cities a rate of return on equity at the low end of the recommended range because some of the flotation costs on which the upward adjustment in the permissible range of return on equity was premised were for securities not yet issued, and it was not certain exactly when they would be issued. However, the ICC apparently accepted Scott Rungren's conclusions, and those of the hearing examiner, that assuming United Cities would issue all of the securities which it had planned to issue, 0.42% would be an appropriate adjustment to the permissible return on equity to reflect flotation costs for the securities.

Excluding flotation costs, Rungren arrived at a permissible range of return on United Cities' equity of 13.2% to 13.8%. With the addition of 42 basis points—.42%—for flotation costs, the permissible range of return became 13.62% to 14.22%, with a midpoint of 13.92%. The flotation costs associated with the May 1989 securities issuance, which United Cities had not yet recovered, were $716,717, while the flotation costs associated with a planned April 1991 securities issue were $862,500, for total claimed flotation costs of $1,578,677.

■ Prior to its decision in this case, the ICC apparently permitted utilities to amortize the actual or estimated dollar amounts of flo-

tation costs over the period of time that new rates were expected to be in effect, even if the securities to which the expenses were attributable had not yet been issued when the ICC entered its order. (See *Re Illinois Power Co.* (1983), 51 P.U.R.4th 39, 83.) Of course, the ICC is not prohibited from changing its policies with regard to substantive issues such as this, so long as the changes are not effectuated in an arbitrary and capricious manner. (See *City of Chicago v. Illinois Commerce Comm'n* (1985), 133 Ill. App. 3d 435, 440-41, 478 N.E.2d 1369, 1373-74.) As United Cities points out, administrative agencies may not, however, depart from prior practices and customs in interpreting their procedural rules, especially where there may have been detrimental reliance on the agency's prior interpretations of its rules. (See *Alton Packaging Corp. v. Pollution Control Board* (1986), 146 Ill. App. 3d 1090, 1093-94, 497 N.E.2d 864, 866-67.) In this case, though, the determination as to the manner in which a utility may recover security issuance expenses from its ratepayers is more in the nature of a policy determination than an interpretation of the administrative agency's procedural rules. Moreover, United Cities would presumably be permitted to seek adjustments of its rates in future proceedings before the ICC to recover any expenses related to its 1991 securities issue which were not recovered in the present proceeding. United Cities does not suggest how it would be irreparably prejudiced by the ICC changing its policy as to this matter.

Accordingly, although the ICC is not precluded from changing its rate-making policy by excluding flotation costs attributable to unissued securities from the expenses utilities may recover from their customers, the ICC nevertheless has insufficient evidentiary support for its decision with respect to United Cities' authorized rate of return on common equity. The ICC provided no findings to support its departure from the midpoint of the range of return on common equity premised solely on flotation costs attributable to already issued securities.

Of the flotation costs United Cities sought to recover, 45.4% were attributable to securities issued in May 1989, and the remainder were attributable to securities which had yet to be issued. Of the 42 basis points (0.42%) by which the range of return on equity was increased to account for flotation costs, 19.07 basis points (0.1907%) were attributable to already issued securities. The permissible range of return, increased by flotation costs attributable to previously issued securities, would be 13.907% to 13.9907%, with a midpoint of 13.6907%. Thus, if a range of return on equity based on only the flotation costs of already issued securities is utilized, the rate of return on equity allowed by the ICC, 13.62%, is still below the midpoint of this range.

The record contains no explanation for the ICC not permitting United Cities a rate of return on equity which is at the midpoint of this range.

■ A departure from the midpoint of the permissible range of return increased by the flotation costs of already issued securities would perhaps be an appropriate exercise of the ICC's judgment and discretion, provided the ICC stated a basis for such a holding. In this case, however, the ICC did not state any reasons which support its decision to depart from the midpoint of this range of return on equity. The ICC's order, therefore, does not contain sufficient findings of fact to permit intelligent review of its decision. (*Chicago & West Towns Rys., Inc. v. Illinois Commerce Comm'n* (1947), 397 Ill. 460, 467, 74 N.E.2d 804, 808.) For this reason, we reverse the portion of the ICC's order concerning United Cities' authorized rate of return and remand with directions that the ICC make further findings as to this matter.

### III. CONCLUSION

Pursuant to our authority under section 10—201(e)(iv)(A) of the Public Utilities Act (Act) (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—201(e)(iv)(A)), we reverse that portion of the ICC's order denying United Cities recovery of the costs of the consulting and noncompete agreement into which it entered when it acquired Union Gas as against the manifest weight of the evidence. Pursuant to our authority under section 10—201(e)(iii) of the Act (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—201(e)(iii)), we also reverse that portion of the ICC's order dealing with United Cities' authorized rate of return because it does not contain findings sufficient to permit informed judicial review thereof; and this cause is remanded to the Illinois Commerce Commission with directions to make findings that explain its departure from the midpoint of the range of return on equity premised on flotation costs attributable to securities which United Cities had already issued. In all other respects, the order of the Illinois Commerce Commission is affirmed.

Affirmed in part; reversed in part and remanded with directions.

McCULLOUGH and LUND, JJ., concur.