948

BUSINESS AND PROFESSIONAL PEOPLE FOR THE PUBLIC INTEREST, Petitioner-Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.—GOVERNOR'S OFFICE OF CONSUMER SERVICES, Petitioner-Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.—COMMONWEALTH EDISON COMPANY, Petitioner-Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.—THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* THE ILLINOIS COMMERCE COMMISSION, Plaintiff-Appellee, v. COMMONWEALTH EDISON COMPANY, Defendant-Appellant (Business and Professional People for the Public Interest *et al.*, Intervenors-Appellees).

First District (5th Division) Nos. 87—3356, 87—3373, 87—3408, 87—3846 cons.

Opinion filed June 10, 1988.—Rehearing denied July 14, 1988.

Alexander Polikoff, Howard A. Learner, and Robert L. Jones, Jr., all of Chicago, for Business and Professional People for the Public Interest.

William J. Herrmann and David Rosenblatt, both of Chicago, for Governor's Office of Consumer Services.

Neil F. Hartigan, Attorney General, of Springfield (Clyde Kurlander, Edward P. O'Brien, and John P. Kelliher, Special Assistant Attorneys General, of Chicago, of counsel), for Illinois Commerce Commission.

Paul F. Hanzlik, Peter Thornton, and Kevin J. O'Brien, all of Isham, Lincoln & Beale, and Kevin M. Forde and Katrina Veerhusen, both of Kevin M. Forde, Ltd., both of Chicago, for Commonwealth Edison Company.

Norman Hirsch and Stuart Gimbel, both of Jenner & Block, of Chicago, for Citizens Utility Board.

JUSTICE MURRAY delivered the opinion of the court:

This is a consolidated appeal of four cases, all of which concern an Illinois Commerce Commission (Commission) order entered on October 7, 1987, directing Commonwealth Edison Company (Edison) to refund $70,019,453 plus interest to its customers by means of the fuel adjustment rate. The order resulted from a reconciliation hearing during which the Commission reviewed Edison's costs of fuel and purchased power for 1983. Pursuant to section 4—402 of the new Public Utilities Act, review of the Commission's order is governed by the public utilities law in effect at the initiation of the reconciliation hearing (August 22, 1984). Ill. Rev. Stat. 1987, ch. 111⅔, par. 4—402.

In appealing from the Commission's order, Edison argues that the Commission exceeded its statutory authority in ordering a refund, the finding of Edison's imprudence was not based on substantial evidence, Edison was denied due process of law, the Commission's award of interest was erroneous, and the trial court abused its discretion in entering a mandatory injunction order. The other parties to this appeal, Business and Professional People for the Public Interest (BPI), Governor's Office of Consumer Services (GOCS), Citizens Utility Board (CUB), and the Illinois Commerce Commission, support the propriety of the refund order. However, the parties disagree as to the awarded interest; their respective views on this matter are fully set forth later in this opinion.

This appeal constitutes the initial challenge to the extent of the Commission's authority under the fuel adjustment rate provision of the Act (Ill. Rev. Stat. 1983, ch. 111⅔, par. 36 (now Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—220)).[1] Before addressing the issue of whether the Commission exceeded its authority, it is necessary to review the recent background of section 36, now section 9—220.

In 1977, the legislature amended section 36 of the Public Utilities Act (Act) (Ill. Rev. Stat. 1979, ch. 111⅔, par. 36) to authorize the Commission to implement comprehensive, uniform fuel adjustment clauses for public utilities. The relevant portion of section 36 provided:

"Notwithstanding the provisions of this Article, the Commission may authorize the increase or decrease of rates

[1]References herein to the Act are to the "old" Public Utilities Act of 1978 (Ill. Rev. Stat. 1983, ch. 111⅔, par. 1 et seq.) unless otherwise noted.

and charges based upon changes in the cost of fuel used in the generation or production of electric power, changes in the cost of purchased power, or changes in the cost of purchased gas through the application of fuel adjustment clause or purchase gas adjustment clauses. Cost shall be based upon uniformly applied accounting principles. The Commission shall undertake an investigation to determine the feasibility of adopting uniform purchase gas adjustment clauses and fuel adjustment clauses, and report its findings to the Governor and Illinois General Assembly within one year. Annually, the Commission shall initiate public hearings to determine whether the clauses reflect actual costs of fuel or power prudently purchased and to reconcile any amounts collected with actual costs. The Commission shall have authority to promulgate rules and regulations to carry out the provisions of this paragraph." Ill. Rev. Stat. 1979, ch. 111²/₃, par. 36.

Accordingly, beginning in 1978, the Commission was empowered to investigate the feasibility of implementing a uniform fuel adjustment program and, if it decided to do so, was required to conduct annual hearings to reconcile the amounts collected from customers for the costs of fuels (and natural gas) with the "actual costs of fuel or power prudently purchased" as determined by the Commission. Pursuant to section 36, the Commission held extensive hearings, in which Edison actively participated, and subsequently in 1981 adopted General Order 211—the Uniform Fuel Adjustment Clause (UFAC) for electric utilities. (83 Ill. Adm. Code 425 (1983).) The order in which the Commission adopted General Order 211, listed as docket No. 78—0457 (45 P.U.R.4th 1 (1982)), noted that the UFAC provisions must meet the standards set forth in the Public Utilities Regulatory Policies Act of 1978 (PURPA) (16 U.S.C. §2625(e) (Supp. III 1979)). PURPA requires, among other things, that fuel adjustment rates must be designed so as to "insure the maximum economies in those operations and purchases which affect the rates to which such clause applies." 16 U.S.C. §2625(e)(1)(B) (Supp. III 1979).

Docket No. 78—0457 stated that "[i]n a highly inflationary period, a comprehensive fuel adjustment clause is essential and should contain as many features as possible to promote efficient management and foster cost reduction for the benefit of investors and ratepayers alike. The public interest also requires a strong and effective program of close auditing and continuous scrutiny. A comprehensive energy clause is superior to one of narrowed dimension since comprehensiveness tends to reduce distortions and to provide incentives for deci-

sions having the broadest economic merit." 45 P.U.R.4th 1, 5 (1982).

In furtherance of this policy, the Commission included the cost of purchased power and nuclear fuel in the UFAC. Additionally, the Commission noted that section 41 of the Act (Ill. Rev. Stat. 1979, ch. 111⅔, par. 41 (now Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—250)) was an underpinning for General Order 211 so as to provide the Commission with the power to investigate, determine and order, after a hearing, any charge, contract or practice and to establish new rates, charges, contracts, or practices. Throughout the order's text, the Commission referred to the relationship between operating practices and final fuel costs. It stated that principles of economic dispatch would be applied so as to create an incentive for the economical purchases of energy. "Economic dispatch" was defined as "the operation of the electric utility's system, utilizing the source of available power to achieve minimum overall costs, taking into consideration the utility's voltage, frequency, reliability, environmental, safety and service quality requirements ***." (83 Ill. Adm. Code §425.40(a) (1982).) In 1985, the legislature repealed the "old" Public Utilities Act and implemented a new Act. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 1—101 et seq.) However, section 36 of the old Act was rewritten into the new Act as section 9—220 with only minor changes. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—220.) Thus, fluctuations in the costs of fuel and power to a utility are passed through to the consumer on a monthly basis through the fuel adjustment clause.

This appeal arises from a proceeding initiated *sua sponte* by the Commission in 1984, pursuant to section 36, in which it sought to reconcile the amounts Edison collected under its fuel adjustment clause with the actual costs of fuel and power purchased by the utility in 1983. During the hearings, much evidence was introduced regarding the poor performance of Edison's La Salle 1 nuclear power plant, which had been included in Edison's rate base beginning December 1982. The addition of La Salle 1 in the rate base resulted in a large rate increase to consumers because of inclusion of construction costs of the plant. The Commission approved La Salle 1's inclusion after Edison informed it that as of October 20, 1982; La Salle 1 was "in-service"; regular operation, as opposed to test operation, had commenced; the plant would generate substantial electricity on a consistent and sustained basis; and the plant would operate at a capacity level of 60% in 1983. Based on Edison's projections, the Commission approved a $660,700,000 traditional rate increase. .

However, in 1983, La Salle 1 did not operate at all for 243 days out of 400 days (between October 20, 1982, through January 1, 1984)

resulting in only a 17.7% operating capacity. As a result, through means of the fuel adjustment clause, Edison customers were required to pay approximately $70 million more in replacement power costs than would have been incurred if the plant had operated at 60% of its capacity.

During the reconciliation hearings, Edison asserted that La Salle 1 should not have been expected to operate at the same level of capacity (65.9%) attributed to its other nuclear facilities during their comparable start-up times because of the more rigorous restraints imposed by the Nuclear Regulatory Commission's start-up testing program. La Salle 1 was the first reactor of its type to come on line after the Three Mile Island accident. Edison also contends that the plant's reduced capacity was due in part to unanticipated equipment malfunctions. Moreover, it argued that the 60% operating capacity figure projected by an Edison witness to the Commission in 1982 was inaccurate as demonstrated by a 40% or higher projection in a 1982 document known as the Murphy/Huemann letter.

Following the reconciliation hearings, the hearing officer concluded that Edison had been imprudent in placing La Salle 1 in service in 1982 and recommended a refund of over $70 million to the customers. A majority of the commissioners affirmed the refund, but determined that Edison's prediction of La Salle 1's 1983 operating capacity of 60% had been imprudent. Two of the seven commissioners dissented on the bases that neither an operating forecast nor operating performance was a proper subject of examination in a fuel reconciliation proceeding.

■■ ■ This court's jurisdiction of direct appeals from the Illinois Commerce Commission is governed by section 10—201 of the new Public Utilities Act. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201.) Section 201 grants this court broader powers of review than before in that the court may, in whole or in part, remand, reverse, or affirm an order of the Commission. An order can be reversed, in whole or in part, only if the court concludes that it is not supported by substantial evidence on the record, the Commission lacked jurisdiction to enter the order, or the order, or the proceedings from which it ensued, were violative of the State or Federal Constitution or laws. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e).) Additionally, the Commission's fact findings are *prima facie* true and the burden of proof is on the party appealing from the order. Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(i).

■ The crux of this appeal concerns Edison's assertion that the refund order exceeded the Commission's statutory authority pursuant

to section 36 of the old Act because: (1) the Commission misinterpreted section 36 in finding that it permitted an examination of plant productivity; and (2) such an interpretation violates the rule against retroactive ratemaking. Edison argues that the Commission's jurisdiction in a fuel reconciliation proceeding is limited to determining whether a utility made prudent purchases of power; there is no statutory authority to examine other matters, such as plant productivity. Since interpretation of a statute is a matter of law, this court is not bound by the Commission's interpretation of section 36. However, we agree with the Commission for the following reasons.

■■ ■ The statutory phrase relevant to these proceedings is "the Commission shall initiate public hearings to determine whether the clauses reflect actual costs of fuel or power prudently purchased and to reconcile any amounts collected with actual costs." (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 36.) First, we note that where administration of a broad statutory standard has been delegated to an agency's discretion, courts shall rely upon the agency's interpretation where there is reasonable debate as to the statute's meaning. (*Board of Education v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 493 N.E.2d 1130.) Moreover, it is well established that decisions of the Illinois Commerce Commission are entitled to great deference because they are judgments of a tribunal appointed by law and informed by experience. (*Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 165 N.E.2d 329.) And, such deference is especially appropriate in the area of fixing rates. *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n* (1960), 19 Ill. 2d 436, 167 N.E.2d 414.

■ The language of section 36 demonstrates a grant of broad discretion to the Commission by the legislature. The Commission was authorized to investigate the feasibility of adopting uniform fuel (and gas) adjustment clauses, discretion to implement such clauses, and authority to promulgate rules and regulations therefor. The only precise legislative directives were that the Commission hold an annual reconciliation proceeding and that costs imposed through the UFAC be actual, prudent, and based upon uniformly applied accounting principles.

■■ ■ Moreover, it is appropriate for courts to consider subsequent amendments in construing statutes. (*Ekco, Inc. v. Edgar* (1985), 135 Ill. App. 3d 557, 482 N.E.2d 130.) The legislature in 1985 rewrote the Public Utilities Act but made no substantial changes to the old section 36. It may logically be assumed that, in revamping the Act, the legislature was familiar with the Commission's guidelines set forth in docket No. 78—0457 and the accompanying General Order 211,

adopted in 1981. (83 Ill. Adm. Code 425 (1982).) As discussed above, the order's guidelines clearly indicated that the Commission would consider broad, overall operating factors in determining whether a utility had used the most economic sources of fuel. The order additionally enumerated the standards required by PURPA in the adoption of uniform fuel adjustment clauses, one of which mandated that such clauses "insure maximum economies in those operations and purchases which affect the rates to which such clause applies." 16 U.S.C. §2625(e)(1)(B) (Supp. III 1979).

Thus, under both the Public Utilities Act and the Public Utilities Regulatory Policies Act of 1978, the Commission had authority to inquire into production management in determining whether fuel purchases were "prudently" made. To conclude otherwise would result in an extremely narrow interpretation of a broad grant of statutory power and would also defy common sense. It is true that the amounts collected under the 1983 UFAC reflected Edison's actual costs. However, approximately $70 million of those costs were incurred because La Salle 1 did not operate at its forecasted capacity. At the same time that Edison's customers were paying greatly increased rates based on La Salle 1 being in full operation, they were paying for the purchase of fuels to replace power not generated by the minimally operating plant. If, in a fuel reconciliation proceeding, the Commission could not examine the reasons that necessitated a fuel purchase, the prudence standard would have no effect on ensuring a just and reasonable rate as required by sections 36 and 41 of the Act; a utility could generate electricity in any manner it chose, efficiently or inefficiently, and the Commission would be limited to determining merely whether the utility paid a prudent price for the fuel. We do not believe that this was the intent of either our State legislature or Congress in enacting the fuel adjustment clauses legislation.

■ Edison further asserts that the Commission's order violates the rule against retroactive ratemaking enunciated in *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.* (1954), 2 Ill. 2d 205, 117 N.E.2d 774. However, in *Mandel Brothers*, the Commission, after a traditional rate hearing, approved the proposed rate as just and reasonable, only to be later overruled by the circuit court, which ordered that reparations be paid for the excessive rates. Our supreme court subsequently held that once the commission had determined a rate to be just and reasonable and put it into effect, it could not later determine the rate was excessive. The present appeal does not involve a traditional rate case. The reasonableness of a UFAC cannot be determined until after it has been collected. Moreover, section 36 explicitly

gives the Commission authority to increase or decrease rates through the UFAC "[n]otwithstanding the provisions of this Article." (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 36.) Therefore, it is apparent that the UFAC is an exception to the prohibition against retroactive rate-making.

Accordingly, we hold that the Commission was within its statutory authority when it applied the prudence standard to the reasons for the purchases, and not only to the actual purchase transactions.

 █ The second issue in this case is whether the Commission's finding that Edison was imprudent was based on substantial evidence. The utility further contends that there is insufficient evidence to support the finding that its consumers were harmed by the imprudent forecast. The Commission's findings and conclusions shall be held *prima facie* true. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e)(i).) The Commission found that a reasonable person would not have forecast a 60% capacity factor for La Salle 1 in 1983 given what Edison's management knew or should have known at the time.

The Murphy/Huemann letter, given to the Commission during the 1982 rate hearings in support of placing La Salle 1 in the rate base, contained Edison's representations that "regular operation" had begun and that it was operating at a 40% capacity and would continue at that level or higher levels of operation. Furthermore, the operations manager of Edison's nuclear stations division stated on cross-examination at the reconciliation hearings that Edison had projected a 60% operating capacity for 1983. The Commission determined such a prediction was imprudent because Edison was aware of increased testing requirements for nuclear plants after the Three Mile Island accident and, moreover, that Edison was aware that La Salle 1 was a less mature plant than its other nuclear plants had been when placed in service. In other words, the evidence shows that the time allocated by Edison between La Salle 1's start-up time and its in-service date was considerably less than that needed to work out probable malfunctions by Edison's other nuclear units. And, the evidence also supports a finding that Edison was aware, or should have been aware, that La Salle 1's start-up testing would take substantially more time than had the other plants.

 Concerning Edison's argument that its customers were not harmed, the record shows that customers had to pay higher rates for nuclear energy that never materialized and, at the same time, also paid for more expensive energy to replace the energy not produced by La Salle 1. This, in effect, resulted in a double charge and did harm the ratepayers.

■■■ Next, Edison contends that it was deprived of due process because it had no notice that imprudence in forecasting would be an issue in the reconciliation proceedings. Contrary to Edison's assertions, the Commission's order in Docket 78—0457 and General Order 211 clearly gave notice to utilities that it considered operating practices significant to final fuel costs. Moreover, Edison had 1½ years during the reconciliation hearings to present its evidence and arguments to counter the allegation of imprudence. And, based on *Starkey v. Civil Service Comm'n* (1983), 97 Ill. 2d 91, 454 N.E.2d 265, the Commission could accept or reject the hearing examiner's conclusions as long as the evidence substantially supported the Commission's order. Under this court's present powers of review, it can remand the Commission's order for the taking of additional evidence if the evidence has been discovered after the termination of the reconciliation proceeding and the evidence could not have been obtained during such proceeding and is material and not cumulative. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e)(ii); Ill. Rev. Stat. 1987, ch. 110, par. 3—111(7); 107 Ill. 2d R. 335.) Edison has suggested no such evidence in these appeal proceedings. We therefore conclude that Edison's due process contention is without merit.

We next address the interest issue raised in the appeals filed by BPI and GOCS (docket Nos. 87—3356, 87—3373). BPI and GOCS contend that interest was properly awarded on the refund,[2] but that the Commission's order providing that interest on the refund run from the date of its order and specifying an interest rate of 5% is erroneous. They argue that the interest should run from the date of the overpayment in 1983 and the interest rate should be 9% from the date of overpayment (pre-order) as well as after the date of the Commission order (post-order). In support of their first contention that the imposition of interest was proper and it should run from the date of overpayment, they rely on section 72 of the Public Utilities Act (Act) (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 76), which provides that interest shall run "at the *legal rate from the date of payment* [by consumers] of such *excessive* or unjustly discriminatory amount." (Emphasis added.) With respect to their argument that both pre- and post-order interest should be 9% instead of 5%, they rely on (1) the past interest rates charged by and against Edison under other circumstances and

---

[2]The Commission's order does not include any explanation of the specific authority upon which it imposed the 5% interest on the refund, how it determined the rate of 5%, or what the interest represents (although it appears that it was intended as a post-order interest).

section 2—1303 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1987, ch. 110, par. 2—1303), which provides that "[j]udgments recovered [upon any award, report, or verdict] in any court shall draw interest at the rate of 9% per annum from the date of the judgment."

The Commission and Edison contend that section 72 of the Act and section 2—1303 of the Code are not controlling in this case because the Commission's order was issued pursuant to section 36 of the Act, rather than section 72, and the order is not a "judgment" or "award" within the meaning of section 2—1303. The Commission also argues that the refund ordered by it is analogous to a "settlement of an account," thus triggering a 5% interest rate as prescribed by section 2 of the Interest Act (Ill. Rev. Stat. 1987, ch. 17, par. 6402). Edison takes a further step in asserting that the Commission has no statutory authority under section 36 to award *any* interest on the refund.

■■■ We agree with Edison and hold that the Commission had no statutory authority to impose either pre- or post-order interest on the refund under section 36 or section 72.

As indicated previously, UFAC consists of a mathematical formula which is simply an addition to Edison's filed schedule rates. UFAC allows Edison's charges to its consumers to fluctuate from month to month so as to reflect changes in its costs of fuel and purchased power. Fair compensation to both consumers and utilities is the objective of section 36. After the reconciliation hearing in which the Commission found that Edison had imprudently purchased fuel and power as a result of La Salle 1's failure to generate adequate power, the overcollection of charges by Edison under the UFAC was ordered to be returned to consumers in the form of a *rate adjustment, i.e.,* a decrease in the amounts charged consumers over a period of one year.

With respect to the issue of interest on the refund, we first note that section 36 contains no interest provision concerning fuel reconciliation refunds based on overcollections or undercollections. Nor does Rule 211, which was appended to the Commission's order adopting the UFAC. On the other hand, subsections (a) and (b) of section 36, which pertain to a utility's recovery of certain taxes assessed against it by municipalities and the State by passing them on to consumers as an additional charge, *do* contain express interest provisions whereby consumers are to be paid interest on any refund they may be entitled to due to a utility's "incorrect" charges.

Based on the above, we believe that had the legislature intended to allow interest on fuel reconciliation refunds, it could have so provided in the paragraph concerning reconciliation hearings as it did in subsections (a) and (b) of the same section. See *Sammis v. Clark*

(1852), 13 Ill. 544 (when a legislature has enumerated a variety of cases in which creditors shall be allowed to receive interest, it may be insisted that the legislature did not intend to allow interest in those cases not so enumerated).

We also find as unpersuasive BPI and GOCS's argument that since section 36 "provides only the barest framework within which the commission is to operate in the UFAC context and does not set forth *any* details governing UFAC implementation, \*\*\* nothing may be read into the General Assembly's failure to specify a particular detail such as interest." The Commission's order adopting the unform fuel adjustment clause (docket No. 78–0457) *is extremely detailed,* and conspicuously, neither the text. of that order nor Rule 211 appended thereto discusses or includes a provision concerning interest or undercollections or overcollections made as a result of the UFAC.

We further observe that to allow interest on overcollections to consumers suggests to us, based upon the fair compensation objective of section 36, that a utility be allowed interest on undercollections. However, such a result would actually contravene section 36's prime objective of fair compensation, *i.e.*, consumers would be penalized for changes in fuel costs beyond their control; they would be charged an additional amount above Edison's actual costs in the form of interest, thereby enriching Edison to their detriment.

We also note that rather than imposing interest on either undercollections or overcollections, it appears from the language of section 36 that the specific method of allowing increases or decreases in rates to *absorb* any inequity between consumers and utilities was the desired intent of the legislature. That use of this method, rather than the imposition of interest, was the intent of the legislature is further supported by the fact that no interest provision exists with respect to temporary orders the Commission may enter *pursuant to section 36* when it determines, after examining reports, that the net income of a public utility is in·excess of the amount required for a reasonable return upon the value of its property used in rendering services to the public. In this situation, section 36 merely provides that the Commission may enter a temporary order *reducing* the utility's rates and charges only to the extent that the reductions *absorb* not more than the amount found by the Commission to be in excess of the amount of income as determined by the Commission necessary to provide the utility with a reasonable return on the value of its property. This provision further provides that where the rates or charges as finally determined by the Commission, after disposition of the issues involved in·the proceeding, are in excess of the rates and charges prescribed in

the temporary order, the utility shall be permitted to amortize and recover by means of a *temporary increase* over and above the rates and charges prescribed in the temporary reduction order and the gross income which would have obtained during the period such temporary reduction order was in effect. There is no provision that a utility subsequently recover interest as a result of the operation of this provision.

In light of the foregoing and the statute's silence on the question of interest on undercollections and overcollections determined after a fuel reconciliation hearing, we find section 36 discloses a legislative intent to deny interest on fuel reconciliation refunds. See *Lakefront Realty Corp. v. Lorenz* (1960), 19 Ill. 2d 415, 167 N.E.2d 236.

■■ ■ With respect to BPI and GOCS's section 72 argument that consumers are entitled to interest from the day of overpayment in 1983 at the "legal rate," of 9%, we first note that to date the Commission has not imposed pre- or post-order interest in fuel reconciliation proceedings in which it found that Edison had undercollected or overcollected fuel charges. (See Illinois Commerce Comm'n v. Commonwealth Edison Co. (November 14, 1985) Nos. 78—0376, 80—0192, 81—0119, 82—0152, 83—0596.) We further observe, as the Commission points out, that section 72 "is geared toward recovering funds that a utility *acquired by charging more than its filed tariffs allow*," while a reconciliation under section 36 "looks to the nature of funds *acquired by charging according to commission-approved tariffs*." (Emphasis added.) It is well settled that "[a]n ICC-approved rate cannot be termed excessive for the purpose of awarding reparations" under section 72 of the Act. (*Pelley v. Illinois Municipal Water Co.* (1986), 142 Ill. App. 3d 765, 768, 491 N.E.2d 1338; see also *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.* (1954), 2 Ill. 2d 205, 117 N.E.2d 774.) In Illinois, the uniform adjustment clause is defined as a "*tariff provision, approved by the commission in advance,* as a policy option, whereby a change in certain fuel costs *** will automatically permit a change in the price charged consumers, without the delay and expense of a formal regulatory hearing." (Emphasis added.) (45 P.U.R.4th 1, 3 (1982).) Thus, notwithstanding the fact that Edison's 1983 UFAC charges would be subject to a later reconciliation proceeding of the amounts collected with actual costs prudently incurred, the charges were nonetheless initially approved charges lawfully passed on to consumers through the UFAC. It therefore cannot be said that Edison charged "excessive" rates in 1983 which would give rise to a claim for reparations under section 72 at a "legal rate from the date of overpayment." Accordingly, we find that section 72 does not support the parties' arguments that the imposition of inter-

est on the refund was proper and that it should run from the date of overpayment (pre-order).[3]

With respect to the Commission's contention that post-order interest is proper, it first argues "that the money in question was given to Edison to pay for fuel purchases" as they arose, it used the money for that purpose, and, therefore, Edison "did not have the use of the money during the time in question and should not be liable for interest prior to the entry of its order." On the other hand, it asserts that as of the date of its order, "Edison began holding funds rightfully belonging to its customers" and, for this reason, "Edison should pay at least the legal rate of interest for the use of ratepayers' funds during the period following the commission's reconciliation as to whom the funds in question belong." In likening the fuel reconciliation refund to a "settlement of an account," the Commission therefore contends that the 5% interest imposed by the Commission on the refund was the proper "legal rate" based on section 2 of the Interest Act (Ill. Rev. Stat. 1985, ch. 17, par. 6402) as post-order interest.

In support of its argument, the Commission relies on *Citizens Utility Co. v. Illinois Commerce Comm'n* (1987), 157 Ill. App. 3d 201, 510 N.E.2d 52. In *Citizens Utility,* the court held that the Commission, pursuant to section 72 of the Act, was authorized to impose a 5% interest on a refund from the utility to a consumer who paid charges for seven years for sewer services never rendered to it; the Commission's authority was based on the same authority it had under sections 32 and 64 of the Act (Ill. Rev. Stat. 1983, ch. 111²/₃, pars. 32, 68) to order the utility to cease violating the Act in making unjust and unreasonable charges for services never rendered. Although the basis upon which the court determined the 5% interest figure is not indicated in the court's opinion, here the Commission contends that the court probably looked to section 2 of the Interest Act (Ill. Rev. Stat. 1987, ch. 17, par. 6402).

We find *Citizens Utility* inapplicable in this matter, however, since we have determined that section 72 does not apply where the Commission has approved the rates complained of which resulted in over-collections and that section 36 indicates a legislative intent to deny

---

[3]In various respects, the parties rely on *Citizens Utility Co. v. Illinois Commerce Comm'n* (1987), 157 Ill. App. 3d 201, 510 N.E.2d 52, for the proposition that since section 72 is the "only" interest provision in the Act, it is to be applied where reparations are sought for excessive charges regardless of the section of the Act which forms the basis of an action. However, no such rule is stated in *Citizens Utility* and, in any event, that case is clearly inapplicable since ICC-approved rates cannot be the basis for reparations for alleged excessive charges.

imposition of interest on refunds ordered thereunder. Under these circumstances, no authority exists here to fashion a remedy to include the imposition of either pre- or post-order interest.

■■■ We next address BPI and GOCS's argument, based on their contention that the refund is the equivalent of a "judgment for the *award* of damages," that 9% interest on the refund is proper on post-order interest pursuant to section 2—1303 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1303).

Notwithstanding that a Commission order may be likened to a judgment because it has the force of law and the Commission may seek *mandamus* or injunction to enforce compliance with its orders and impose penalties for violation of its orders (Ill. Rev. Stat. 1987, ch. 111⅔, pars. 4—202, 5—202), the refund order in this case cannot be deemed a damages "award" required under section 2—1303 to impose "post-judgment" interest. As stated in *Ferndale Heights Utility Co. v. Illinois Commerce Comm'n* (1982), 112 Ill. App. 3d 175, 445 N.E.2d 334, the Commission has no general authority to fashion an award of damages and the fact that a payment of money is made necessary by the effect of the Commission's order is merely incidental to the Commission's action. Accordingly, the refund ordered in the present case cannot be considered an award of damages, and, therefore, section 2—1303 of the Code cannot be the basis for imposing post-order interest. Moreover, as discussed above, the imposition of interest would be in direct conflict with the legislature's intent to deny interest subsequent to reconciliation proceedings under section 36.

■■■ Finally, we observe that imposition of post-order interest would also contravene the fair compensation objective of section 36. Here, the traditional rate in December 1982, which included operation of La Salle 1 in the rate base, and the subsequent monthly UFAC rates were both approved by the Commission and lawfully passed on to Edison's customers. The 1983 fuel and power purchase costs paid by Edison were actually incurred. The rates charged and funds received from consumers through the UFAC were immediately paid by Edison for its current costs over a 12-month period; no funds were accumulated therefrom or interest received thereon. Correspondingly, the Commission has ordered Edison to make payment of a $70 million refund to consumers for overcollected funds based on its imprudent fuel and power purchases over a similar 12-month period. The Commission's order is in accord with the use of a decrease or increase in rates to settle any inequity between Edison and its customers based on the method devised by the UFAC. Where costs

are less one month, rates are decreased, and where costs are more, rates are increased. In this instance, where costs are more and rates increased, fairness of compensation to Edison required that Edison be allowed to increase its 1983 rates pursuant to the UFAC, subject to a reconciliation proceeding. Edison should not be penalized for utilizing the UFAC method created by the legislature, notwithstanding that the Commission later determined that some of its costs were imprudently incurred, than should consumers be for undercollections in other years. No violation of the Act has occurred here, like the one found in *Citizens Utility*, as a result of Edison's imprudent purchases. Edison did not violate any provision of section 36; it made imprudent purchases as determined pursuant to section 36, *which allows for the eventuality of imprudent purchases* and provides a method of compensating consumers for those funds collected and constituting a correspondingly overcollection.

For the foregoing reasons, therefore, we reverse that portion of the Commission's order imposing interest.

The final issue to be determined in this matter concerns the interlocutory appeal (docket No. 87—3846) filed by Edison seeking "dissolution" of the mandatory injunction issued against it on December 23, 1987, by the trial court directing it to commence payment of the refund in monthly installments to its customers on January 4, 1988.

After the issuance of the Commission's order on October 7, 1987, the parties proceeded as follows: On October 14, Edison filed an application for rehearing on the refund order and a motion for stay with the Commission; on November 4, the Commission denied Edison's rehearing application and motion for stay; on November 9, Edison filed a petition for review of the Commission's order and a motion for stay with this court; on November 13, while Edison's petition for review and motion for stay were under advisement in this court, the Commission filed an action in the trial court for a mandatory injunction against Edison to require it to begin making monthly installment "payments" to its customers pursuant to the refund order; on December 3, the trial court denied a motion by Edison to dismiss the injunction action and, on the same day, granted BPI, GOCS and CUB leave to intervene as plaintiffs; on December 23, the trial court entered an injunction order directing Edison to comply with the refund order by January 4, 1988, but stayed enforcement until December 24; on December 24, this court stayed the trial court's injunction order until January 5, 1988; on January 6, 1988, this court stayed the refund order and renewed the stay of the trial court's injunction order.

On appeal, Edison argues that the injunction order should be re-

versed and vacated "in light of this Court's stay of the Commission Order of October 7, 1987 and the stay of the Circuit Court's Order" or, alternatively, the injunction order should be reversed because: "(a) it was based on a Commission Order which was beyond its statutory authority and therefore unenforceable under Section 4—202 of the Public Utilities Act; (b) Edison was not in violation of that order at the time the injunction was entered; and (c) the prerequisites for injunctive relief were not present." Edison also argues that section 4—202 violates the separation of powers doctrine and is unconstitutional. For the reasons set forth below, we affirm the trial court's injunction order.

■■■ We reject Edison's first argument that "by virtue of this Court's stay order there is presently no *enforceable* order upon which the injunction can be based and Edison is excused from compliance with the Commission Order." (Emphasis added.) We find Edison's argument confusing. Edison appears to argue that since its motion for a stay was pending in this court, the trial court was without jurisdiction to enter the injunction order. However, a stay order, by its very nature, does not destroy the enforceability of an underlying order—it merely suspends its enforceability. (*Gregory v. First National Bank & Trust Co.* (1980), 84 Ill. App. 3d 957, 406 N.E.2d 583.) Secondly, this simply is not a situation where the trial court entered its order after a stay was granted by this court; the stay in this court was under advisement and thus could not affect the trial court's jurisdiction to enter an injunction order. If Edison intended to argue other than what we have interpreted to be its argument on this point, we believe the result would be the same; we find no legal procedural impediment to the entry of the injunction order by the trial court or any mootness of the order by reason of the stay.

■■■ Similarly, we reject Edison's argument that the trial court lacked jurisdiction to enter its order because the Commission was without statutory authority to enter a refund pursuant to section 36 of the Public Utilities Act (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 36). As discussed in appeal No. 87—3408, the Commission did have authority to enter the refund order and, accordingly, the Commission properly sought enforcement of the order pursuant to section 4—202 of the Act (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 4—202), which provides that when the Commission is of the opinion that a party is failing to do anything required by law or by order or direction of the Commission, the Commission may seek enforcement by *mandamus* or injunction under section 4—202.

■■■ Edison further contends that its failure to begin making re-

funds immediately after issuance of the Commission order was not violative of the order and, therefore, the trial court should not have issued the injunction. The relevant language of the order states as follows:

> "[S]aid refunds of $70,019,543, plus interest, to customers should be made through the Ro factor of Edison's UFAC over a one year period from the date of this Order."

Edison argues that based on the order's language its conduct was not violative of the Commission's order since the terms of the order imposed no obligation upon it to pay the refund at any specific time, except that it be paid over a one-year period; that the Commission's order providing for interest on the refund payments "suggests that it anticipated some kind of delay in payment, either because of the time needed by Edison to make the necessary administrative adjustments, or because of a possible stay of the Order pending appeal"; that if the Commission intended the payments to commence October 7, "it would have said so"; and that the "commission's silence on the practical specifics of the refund process" was intended to "prudently" leave "the timing of repayment to Edison while protecting the interests of ratepayers through the assessment of interest."

The Commission and the intervenors interpret the order to require Edison to begin making refunds as soon as practicable after October 7 in monthly installments, and the trial court so ordered.

We find Edison's arguments unpersuasive. Although the order does not contain a specified date and manner of payment, we believe the interpretation of the order by the Commission, intervenors, and the trial court is correct under the circumstances. The purpose of the UFAC is to allow for *monthly* adjustments of rates to reflect a utility's fluctuating costs of fuel and power. The Ro factor is defined as an "ordered reconciliation factor" which is one of the factors of the UFAC formula in determining the *monthly* fuel adjustment rate, and Edison, using the UFAC formula, is required to file a report *each month* with the Commission. Accordingly, we conclude that the language of the order, requiring Edison to make refund payments through the Ro factor of its UFAC over a one-year period, indicates that it was to make monthly installments to consumers on the refund ordered from October 7, 1987, the date of the Commission's order. In further support of our conclusion, we note that the Commission's order also requires that Edison "report to the Commission on a quarterly basis with respect to the refunds ordered." Such language indicates expected action on Edison's part in making the refunds *each quarter*. To maintain a position that Edison report quarterly to the

Commission for the sole purpose of stating only that it has determined that refund payments during the quarter were not convenient or otherwise transcends common sense.

We further observe that two sections of the Act specifically provide that no delay in compliance with an order of the Commission is permitted unless specifically allowed by the Commission. Section 10—113, entitled "Modification of order or decision—Rehearings—Appeals," provides, in pertinent part, as follows:

> "*An application for rehearing shall not excuse any corporation or person from complying with and obeying any rule, regulation, order or decision* or any requirement of any rule, regulation, order or decision of the Commission theretofore made, *or operate in any manner to stay or postpone the enforcement thereof,* except in such cases and upon such terms as the Commission may by order direct." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—113.)

Section 10—204(a), entitled "Suspension of order of Commission pending judicial review," also provides:

> "*The pendency of an appeal shall not of itself stay or suspend the operation of the rule, regulation, order or decision of the Commission,* but during the pendency of the appeal the reviewing court may in its discretion stay or suspend, in whole or in part, the operation of the Commission's rule, regulation, order or decision." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—204(a).

In light of the above, Edison was clearly in violation of the Commission's order, notwithstanding its assertion that the language of the order was ambiguous and the fact that it had filed applications for review of the order and motion for a stay.

Edison next argues that the injunction was improperly granted because the traditional elements necessary to obtain injunctive relief were not met, *i.e.,* a showing of "extreme urgency," that the petitioning party has no adequate remedy at law and will suffer irreparable injury if the requested injunctive relief is not granted, that granting the injunction will cause only relatively minor loss or inconvenience to the party enjoined, and that the petitioning party has a likelihood of success on the merits.

We disagree. It is well settled that where injunctive relief is expressly authorized as a means of enforcing compliance with a statute, the statute supplants the requirement of proof of the traditional elements necessary to obtain an injunction. (*Sadat v. American Motors Corp.* (1984), 104 Ill. 2d 105, 470 N.E.2d 997.) "The logic behind the

rule is that since the legislature has seen fit to enact legislation, it may be presumed that there is a need for injunctive remedy." (*People ex rel. Edgar v. Miller* (1982), 110 Ill. App. 3d 264, 269, 441 N.E.2d 1328.) Here, section 4—202 is such a statute. Under this section, the Commission is entitled to *mandamus* or injunctive relief upon a showing that a public utility is "failing *** to do anything required of it by law, or by any order *** direction or requirement of the Commission." The Commission established that it had issued an order and Edison had failed to comply with its terms. Accordingly, we reject Edison's argument on this point.

▮▮ Edison's next contention concerns the parties' assertion that a court has no discretion to deny an injunction brought pursuant to section 4—202. In disposing of this issue, we find it unnecessary to address the parties' individual arguments because the language of the section simply does not state that a court has no discretion to deny an injunction. To the contrary, section 4—202 requires the court to, after default in answer or answer, immediately inquire into the *facts and circumstances of the case*. We also observe that although section 4—202 initially states that a violation or threatened violation of a Commission's rule, order, decision, regulation, direction or requirement may be stopped and prevented either by *mandamus* or injunction, it further states that "[t]he final judgment in any action or proceeding shall either *dismiss the action *** or* grant relief by mandamus or injunction." Accordingly, we interpret this language to in fact give a court discretion, *i.e.*, it may dismiss an action for injunctive relief after inquiry, albeit limited, into the facts and circumstances of the case *or* it may grant *mandamus* or injunction.

▮ Edison's final argument is that section 4—202 violates the separation of powers doctrine and is therefore unconstitutional. Specifically, it asserts that section 4—202 *appears* to direct how a court of equity's discretion shall be exercised by "mandating that [injunctive relief] be the norm rather than the exception" and "by precluding the court from undertaking the traditional inquiry into whether an adequate legal remedy is available." We find the first part of this argument completely specious and the second part without merit in light of our discussion above concerning supplantation of the traditional elements necessary to obtain an injunction by a statute expressly authorizing injunctive relief. We also reject as specious Edison's argument that section 4—202 interferes with a court's control of its own docket because it shortens the time in which a public utility may respond to a Commission complaint to a period of 20 days and because it requires a court to *immediately inquire into* the facts and circumstances of the

case "to the exclusion of other pressing matters on its docket." Edison's first assertion is merely just that. Its second contention is plainly a misstatement and an attempt to reword section 4—202; we do not find the phrase "to immediately inquire into" the equivalent of "to the exclusion of other pressing matters on [the court's] docket."

For the foregoing reasons, therefore, we affirm the propriety of the Commission's refund order, but reverse the interest provision thereof. We also affirm the trial court's order of injunction, but direct that it be modified to eliminate the interest provision. We further direct that the stay of the injunction order continue until the time for filing a petition for rehearing in this court or a petition for leave to appeal in the supreme court expires.

Nos. 87—3356, 87—3373—Reversed.
No. 87—3408—Affirmed.
No. 87—3846—Affirmed, with directions.

LORENZ, P.J., and O'CONNOR, J., concur.