(No. 50545.—

RURAL ELECTRIC CONVENIENCE COOPERATIVE CO., Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.,* Appellees.

*Opinion filed March 20, 1979.*

Edward G. Pree, of Pree & Pree, of Springfield (Jon W. DeMoss, Albert J. Cross, and Michael W. Hogan, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield (Hercules F. Bolos, Special Assistant Attorney General, and James E. Weging, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Commerce Commission.

Elmer Nafziger, of Nafziger & Otten, of Springfield, for appellee Central Illinois Public Service Company.

James H. Eddleman, of Springfield for *amicus curiae*

Association of Illinois Electric Cooperatives.

MR. JUSTICE CLARK delivered the opinion of the court:

This is a dispute over which of two "electric suppliers" (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 403.5) is entitled to serve a major, new, commercial customer. The plaintiff, Rural Electric Convenience Cooperative Co. (Cooperative), is an "electric cooperative" within the meaning of section 3.4(b) of the Electric Supplier Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 403.4(b)). The principal defendant, Central Illinois Public Service Company (Utility) is a public utility within the meaning of section 10.3(c) of the Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 10.3(c)). (Both "public utilities" and "electric cooperatives" are "electric suppliers" subject to the Electric Supplier Act. (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 403.5.)) Early in 1974, the defendant-intervenor, Freeman Coal Mining Company (Freeman), discussed with Utility plans to construct a new coal mine in the west half of Section 23, Township 12 North, Range 6 West of the Third Principal Meridian, Macoupin County. Shortly thereafter, Utility served notice upon Cooperative pursuant to section 7 of the Electric Supplier Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 407) that Utility intended to extend certain of its existing lines to provide service to the Freeman mine. Cooperative thereupon brought this action before the defendant Illinois Commerce Commission (Commission) complaining that Cooperative, and not Utility, was entitled to provide service to the mine.

The Commission found in favor of Utility, and, on administrative review, the circuit and appellate courts affirmed. (56 Ill. App. 3d 281.) We granted Cooperative's petition for leave to appeal pursuant to our Rule 315 (65 Ill. 2d R. 315), and now we vacate the judgments and set aside the order below and remand the cause to the

Commission with directions.

The starting point of our analysis is the Electric Supplier Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 401 *et seq.*). Several sections of the Act set forth a comprehensive scheme for determining which of two or more contending suppliers is entitled to serve a given customer or location. (*E.g.,* Ill. Rev. Stat. 1977, ch. 111 2/3, pars. 405, 408.) However, section 2 of the Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 402) states as follows:

> "The General Assembly declares it to be in the public interest that, in order to avoid duplication of facilities and to minimize disputes between electric suppliers which may result in inconvenience and diminished efficiency in electric service to the public, any 2 or more electric suppliers may contract, subject to the approval of the Illinois Commerce Commission, as to the respective areas in which each supplier is to provide service."

Section 6 reiterates this point:

> "Any 2 or more electric suppliers may contract together defining and delineating, as between themselves, one or more service areas in which each such contracting supplier shall be entitled to furnish service. Such contracts are subject to the approval of the Commission." (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 406.)

These two sections make clear that, once properly approved by the Commission, such service area agreements control the rights of the parties to the agreement, to the exclusion of the Act, except insofar as the agreement incorporates the Act. (We are not faced here with any claim that the agreement is repugnant to the purposes of the Act and therefore void.)

Utility and Cooperative have entered into such a service area agreement, dated February 19, 1969, which was approved by the Commission by an order dated April 9, 1969 (Commission Docket No. ESA—100). Section 2 of that agreement provides in part that,

> "The parties hereto covenant and agree that Coopera-

tive shall be entitled exclusively to serve all consumers with their electric service requirements in the area or areas designated as RECC on the maps hereto attached ***."

It is undisputed that the Freeman mine is located within the area Cooperative is "entitled exclusively to serve" by virtue of the agreement and that Utility's rights therefore depend upon the applicability of one of the exceptions to the above-quoted language of the agreement.

The exception upon which Utility relies provides as follows:

"[P]rovided further, however, whenever the electrical load of a prospective consumer in any area outside of incorporated areas is such that its anticipated load during the first year of normal operation will require, as determined in accordance with accepted engineering practices, that the load be supplied through a connection to and/or an extension of an existing as of July 2, 1965 line having a voltage of 34.5 KV or higher, the supplier shall be determined under the Electric Supplier Act as approved July 2, 1965."

It is undisputed that the Freeman mine will require service by a line having a voltage of 34.5 KV or higher. However, it is hotly disputed as to whether "accepted engineering practices" would dictate "that the load be supplied through a connection to and/or an extension of" a line which was in existence as of July 2, 1965, having such voltage. The Commission never decided this precise question, because it failed to give effect to the words "existing as of July 2, 1965." The Commission held:

"This exception, in the Commission's interpretation thereof, purposely left open the question as to who is entitled to serve *any* new loads that may locate in any of the party's respective service areas and would require line voltage of 34.5 KV or higher for the providing of adequate service to such customers." (Emphasis added.)

We disagree. The plain language of the agreement is unambiguous. It does not leave open the question of who is entitled to serve "any" new 34.5 KV or greater loads.

Rather, it only leaves the question open where "accepted engineering practices" would "require" that the load be supplied through a connection to and/or an extension of a line which was "existing as of July 2, 1965." Any other construction would render the term "existing as of July 2, 1965" mere surplusage. Such a construction runs afoul of well-established principles of contractual interpretation (*e.g., Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 283), and no amount of deference to the special expertise of the Commission can overcome this flaw in the Commission's reasoning.

The jurisdiction of the circuit court to review findings of the Commission is limited to that "provided by law." (Ill. Const. 1970, art. VI, sec. 9. See also *People ex rel. Tucker v. Kotsos* (1977), 68 Ill. 2d 88, 99.) The circuit court's jurisdiction in this case is founded upon section 68 of the Public Utilities Act, as amended (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72), which provides that an "order or decision of the Commission shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence ***, or that the [decision] was without the jurisdiction of the Commission." See also *Citizens Utilities Co. v. Commerce Com.* (1971), 50 Ill. 2d 35, 39.

The term "against the manifest weight of the evidence" is broad enough to encompass the alleged invalidity of the Commission's interpretation of the service agreement at issue in this case.

While the approval of electrical service area agreements is a matter within the special competence and statutory discretion of the Commission, we find the Commission's interpretation of the language of this agreement is contrary to established principles of contractual interpretation, and we need not defer to such an interpretation. The interpretation of the unambiguous language of written agreements is a matter which courts tradi-

tionally have considered to be within their special competence, and therefore, not to be left solely to the finder of fact, whether it be a jury (*e.g., Chicago Daily News, Inc. v. Kohler* (1935), 360 Ill. 351, 363) or an administrative agency (4 K. Davis, Administrative Law Treatise 196-97 (1958)). The utility of legally binding agreements between private parties depends upon the degree of certainty with which the parties can predict the meaning of the various terms of their agreement. A greater degree of certainty can be obtained by adherence to established principles of contractual interpretation than by undue deference to a given agency's particular expertise. Especially where, as here, the term in question (existing as of July 2, 1965) is otherwise unambiguous, we do not find that the agency's expertise sheds any additional light upon the question.

Accordingly, we vacate the judgments and set aside the order below and remand the cause to the Commission with directions to determine whether "accepted engineering practices" would require that the Freeman mine's load be supplied through connection to and/or an extension of a line which was in existence as of July 2, 1965. If the Commission finds that "accepted engineering practices" would not so dictate, it is directed to enter an appropriate order in favor of Cooperative. However, if the Commission finds that "accepted engineering practices" would require that the Freeman mine's load be supplied through connection to or extension of a line which was in existence as of July 2, 1965, then it is directed to reinstate its prior order in favor of Utility.

The Commission's findings regarding the application of sections 5 and 8 of the Electric Supplier Act are not against the manifest weight of the evidence. Section 5 provides in part:

> "Each electric supplier is entitled, except as otherwise provided in this Act or (in the case of public utilities) the Public Utilities Act, to (a) furnish service to customers

at locations which it is serving on the effective date of this Act ***." (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 405.)

The Commission found that Utility was not serving any customer at the location of the Freeman mine on the effective date of the Act. The record is not clear as to whether on the effective date of the Act, Cooperative was providing any service at all to the location which now includes the Freeman mine. Rather, the key evidence presented to the Commission on this specific question was the testimony of Cooperative's witness, Roy Goode, who never specifically indicated whether, on the date of the Act, Cooperative was providing service to a customer at the location now occupied by the Freeman mine. On this narrow basis, we affirm the Commission's finding. We therefore express no opinion as to the validity of the suggestion by the Commission and the majority of the appellate court that service by low voltage lines is inadequate to invoke the priority provisions of section 5 as to new customers at a location requiring service by a line having a voltage of 34.5 KV or higher.

Section 8 provides that, in determining which of two electric suppliers should be permitted to furnish service, "the Commission shall act in the public interest and shall give substantial weight to the consideration as to which supplier had existing lines in proximity to the premises proposed to be served, provided such lines are adequate. In addition, the Commission may consider, but with lesser weight, (a) the customer's preference as to which supplier should furnish the proposed service, (b) which supplier was first furnishing service in the area, (c) the extent to which each supplier assisted in creating the demand for the proposed service, and (d) which supplier can furnish the proposed service with the smaller amount of additional investment. The Commission, however, shall give no weight or consideration to the fact that any supplier has or has not been issued a certificate of public convenience and

necessity in the area proposed to be served." (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 408.) The Commission found that Utility, and not Cooperative, had existing adequate lines in proximity to the premises, that Freeman had expressed no preference for either supplier, that neither supplier had assisted in creating the demand for the service, and that the additional investment required was "essentially equal under both electric suppliers' plans of service." The Commission concluded that the public interest requires that Utility furnish the proposed service. We agree with the appellate court that the Commission's ultimate findings regarding the application of the section 8 criteria are not against the manifest weight of the evidence. See 56 Ill. App. 3d 281, 283-84.

For the foregoing reasons, the judgments of the circuit and appellate courts are vacated; the order of the Commerce Commission is set aside, and the cause is remanded to the Commerce Commission with directions to proceed in accordance with the views expressed herein.

*Judgments vacated; order set aside;*
*cause remanded, with directions.*