UNITED CITIES GAS COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, Respondent.

Fourth District   No. 4—91—0940

Opinion filed September 10, 1992.—Rehearing denied November 13, 1992.

Daniel J. Kucera, of Chapman & Cutler, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Carmen L. Fosco, Special Assistant Attorney General, of Chicago, of counsel), for respondent.

JUSTICE STEIGMANN delivered the opinion of the court:

United Cities Gas Company (United Cities) appeals from the orders of the Illinois Commerce Commission (Commission) entered following a proceeding to reconcile revenues collected by United Cities in 1988 with the actual cost of gas purchased for that year. (*Illinois Commerce Comm'n v. Kaskaskia Gas Co.* (Oct. 4, 1991), ____ Ill. Commerce Comm'n Rep. ____ (ICC Nos. 89—0357, 89—0365 cons.) (United Cities Gas Co., respondent in ICC No. 89—0365) (hereinafter *Kaskaskia*).) Specifically, United Cities appeals from that portion of the Commission's orders which denied recovery of $260,553 of gas costs allocated to United Cities' Illinois customers and the Commission's order to refund, with interest, that amount.

We affirm.

## I. FACTS

In September 1989, the Commission commenced reconciliation proceedings in accordance with section 9—220 of the Public Utilities Act (Act) (Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—220) and directed United Cities to present evidence showing its reconciliation of purchased gas adjustment (PGA) clause revenues with the actual cost of gas purchased for the 12 months ending December 31, 1988.

### A. *The Administrative Process*

In *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 200-01, 529 N.E.2d 510, 512-13, the supreme court explained the process by which revenues are received by public utilities as follows:

> "In establishing the rates that a public utility is to charge its customers, the Commission bases the determination on the company's operating costs, rate base, and allowed rate of return. A public utility is entitled to recover in its rates certain operating costs. A public utility is also entitled to earn a return on its rate base, or the amount of its invested capital; the return is the product of the allowed rate of return and rate base. The sum of those amounts—operating costs and return on rate base—is known as the company's revenue requirement. The components of the ratemaking determination may be expressed in 'the classic ratemaking formula R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital).' (*City of Charlottesville, Virginia v. Federal Energy Regulatory Comm'n* (D.C. Cir. 1985), 774 F.2d 1205, 1217, citing T. Morgan, Economic Regulation of Business 219 (1976).) The same formula is used by the Commission in ratemaking determinations for Illinois. The revenue requirement represents the amount the company is permitted to recover from its customers in the rates it charges. Ratemaking is done in the context of a test year ***."

■ Under section 9—220 of the Act, the Commission may authorize utilities in Illinois to recover all gas purchases through the application of the Commission's PGA clause. That section reads as follows:

> "Notwithstanding the provisions of Section 9—201, the Commission may authorize the increase or decrease of rates and charges based upon changes in the cost of fuel used in

the generation or production of electric power, changes in the cost of purchased power, or changes in the cost of purchased gas through the application of fuel adjustment clauses or purchased gas adjustment clauses. \*\*\* Cost shall be based upon uniformly applied accounting principles. Annually, the Commission shall initiate public hearings to determine whether the clauses reflect actual costs of fuel, gas or power purchased to determine whether such purchases were prudent, and to reconcile any amounts collected with the actual costs of fuel, power or gas prudently purchased. In each such proceeding, the burden of proof shall be upon the utility to establish the prudency of its cost of fuel, power or gas purchases and costs." Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—220.

Gas supply costs are recovered exclusively under the PGA clause, while all other costs of service are recovered in base rates. Base rates are set in periodic rate hearings or cases. (See *Citizens Utilities*, 124 Ill. 2d at 200-01, 529 N.E.2d at 512-13.) Under the PGA clause, a gas utility's gas costs are first estimated and then incorporated into a formula that determines in a gas cost rate. This gas cost rate is then used in combination with the base rate to determine a customer's monthly bill. Any fluctuations in the cost of fuel and power incurred by a utility are passed on to the consumer on a monthly basis through the PGA clause. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1988), 171 Ill. App. 3d 948, 955, 525 N.E.2d 1053, 1056.

■ Section 9—220 of the Act requires a gas utility to reconcile the revenues received from customers through the gas cost rate with the gas supply costs it actually incurred for the prior year. Because the gas cost rate as determined by the PGA clause is based on estimates, and actual gas prices can change during the year, there can be either an over collection or an under collection of gas costs by the utility. After reconciliation, the utility collects any "underrecovery" for the year from the customers or refunds any "overrecovery" by adjustments to a factor (R4) of the PGA clause. Any adjustment takes effect the following year. Accordingly, the Commission conducts annual proceedings to reconcile costs and revenues.

The proceedings at issue in this case involve the reconciliation of the gas supply costs and revenues of United Cities in 1988 for its Illinois customers. (This reconciliation procedure is known as a "true-up.")

## B. *Evidence Adduced at the Hearings*

United Cities is an investor-owned public utility regulated by the Commission. It provides natural gas service to five separate Illinois service areas, including Harrisburg, Illinois. United Cities provides natural gas service in seven other States and is subject to the regulatory jurisdiction of those States.

Texas Eastern Transmission Corporation (Texas Eastern) is the pipeline supplier for United Cities' Harrisburg service area, as well as for United Cities' Franklin and Murfreesboro service areas in Tennessee. United Cities' contracts with individual pipeline suppliers are approved by the Federal Energy Regulatory Commission (FERC). United Cities purchased gas from Texas Eastern under a demand/commodity rate schedule that included a fixed demand charge, and a commodity charge based on volume usage. The demand charge is composed of two fees: a contract demand charge and a storage demand charge. In exchange for the contract demand charge, Texas Eastern guaranteed that it would have gas and pipeline capacity to deliver to United Cities' customers. This contract demand charge was a fixed monthly amount paid by United Cities to Texas Eastern. The storage demand charge guaranteed that Texas Eastern would have field storage and tank capacity and actual gas up to the contracted daily maximum quantity required for United Cities' customers.

The demand charge paid by United Cities to Texas Eastern was determined by estimating the demand volume (the company used 19,785 decatherms per month as its estimate) multiplied by the demand rate. This amount was United Cities' gas supply expense that United Cities paid and which was, in turn, passed on to United Cities' customers. These costs were recovered from United Cities' Tennessee and Illinois customers by allocating these costs portionate to each service area's estimated peak day consumption. That is, using the estimated peak day demand for both its Illinois and Tennessee customers, United Cities calculated the proportion of gas used by Tennessee customers and the proportion of gas used by Illinois customers. In 1988, these proportions were 42% for Illinois and 58% for Tennessee. Consequently, United Cities billed 42% of its Texas Eastern demand charge to Harrisburg, Illinois, customers in 1988. Using these allocation factors, United Cities recovered 42% of its demand charge costs from Illinois customers through the PGA clause.

These allocation percentages were determined in 1984 as part of a study performed for and submitted in a rate case before the Tennessee Public Service Commission (Tennessee Commission). United Cities used these allocation percentages when it went before the Tennessee Commission in 1984, 1986, and 1989. These 1984 allocation factors were used for determining customer rates for Harrisburg from 1986 through 1988, and most of 1989, without any interim review by United Cities. United Cities did not review its allocation factors in 1988 because it had just gone before the Tennessee Commission in 1986 and had used the allocation percentages presented at that time to bill its Harrisburg customers. The allocation factors for Harrisburg were not changed until December 1989, at which time Harrisburg's allocation factor was lowered from 42% to approximately 28%.

At the hearing on the 1988 reconciliation, Bobby J. Cline, a rate analyst for United Cities, testified that reconciling the revenues billed under the PGA clause with the gas supply costs under the Texas Eastern contract for 1988 resulted in an "undercollection," and a net amount due United Cities, of $171,170.88. Of that net amount, the underrecovery due from the Harrisburg service area was $72,090.57. That undercollection for 1988 was applied to the R4 factor of the PGA clause in 1989, and was billed and collected from Harrisburg customers from April 1, 1989, through March 31, 1990. (Despite the fact that revenues and costs for 1988 are at issue, the Commission did not initiate these proceedings until September 22, 1989, midway through the year in which the 1988 adjustment was being collected from customers.)

Cline explained the methodology United Cities used to allocate its Texas Eastern demand charges to its Tennessee and Illinois customers (as discussed above). Cline, who was United Cities' only witness in these proceedings, testified that the company did not review the demand cost allocation percentages used in the 1986 Tennessee rate case and applied to both Illinois and Tennessee customers in 1987 because "[e]vidently a person at the work did not see a need to revise the allocation factor[s]." Furthermore, United Cities did not redetermine these allocation percentages for Texas Eastern demand charges in 1988 because it did not file a 1988 rate case challenge in Tennessee. United Cities continued to allocate 42% of its Texas Eastern demand charges to its Harrisburg customers until December 1989, when it changed Harrisburg's allocation of Texas Eastern demand charges to approximately 28%.

Cline added that Tennessee does not have a cost recovery system. In Tennessee, the majority of gas costs are included in the base rates (unlike in Illinois, where gas costs are recovered exclusively under the PGA clause and all other costs of service are recovered in the base rate). Cline testified that, unlike in Illinois, there is no true-up or reconciliation of gas costs and revenues in Tennessee. Cline testified that differences between Illinois and Tennessee administrative procedures prevent United Cities from changing its Tennessee allocation. He explained as follows:

"The Illinois and Tennessee Commissions have different methodologies for recovery of this cost. The gas cost recovery in Illinois is accomplished through the Uniform PGA Clause. The gas cost recovery in Tennessee during 1988 was accomplished through the inclusion of gas cost in both base rates and the PGA. For the period in question, in Tennessee, there is no true-up of gas costs, and there can be no change in demand allocation except in a future general rate case filing."

John A. Link, an accountant for the Commission's public utilities division, testified on behalf of the Commission's staff (Staff) and disputed United Cities' reconciliation only with respect to its Harrisburg service area. Link testified that Harrisburg's actual percentage of peak day demand in 1988 was 28.69% as compared to the 42% projected and allocated by United Cities in 1988. Consequently, Link recommended that the company refund $260,553 (the difference between actual Harrisburg demand and the allocation percentage), plus interest, to the customers in the Harrisburg service area. (This amount would be refunded to Harrisburg customers by applying it to the R4 factor of the PGA clause.) Link testified that this adjustment was necessary because United Cities used outdated allocation percentages in its internal apportionment of demand costs.

Link emphasized that United Cities should have used more current data in allocating demand costs. According to Link, the allocation percentages are nothing more than an internal accounting methodology United Cities used to allocate its fixed Texas Eastern demand charge. He added that, as far as he knew, this was the first case addressing the allocation of demand charges. Finally, Link suggested that the actual costs incurred by United Cities for gas purchased in 1988 had already been collected from Tennessee customers through a combination of PGA revenue and base revenue because of increased unit sales which recovered demand charges

along with other expenses. However, neither United Cities nor Staff had ever determined whether and to what extent United Cities "overrecovered" or "underrecovered" from its Tennessee customers the 58% of the demand charges allocated to Tennessee.

### C. *The Commission Order*

The Commission issued its order on October 4, 1991, agreeing with Staff's adjustment because of the change in proportionate use between Harrisburg and Tennessee customers, and United Cities' failure to review its allocation percentages. That order states, in part, the following:

"The Commission, having considered the entire record herein and being fully advised in the premises, is of the opinion and finds that:

\* \* \*

(4) the evidence indicates that Respondent [United Cities] acted reasonably and prudently in its purchases of natural gas during calendar year 1988;

(5) for calendar year 1988, Respondent's reconciliation evidence indicates that it experienced an undercollection of gas costs in the amount of $171,170.88; this amount was reflected in Respondent's R4 factor filed in 1989 [and recovered from customers between April 1, 1989, and March 31, 1990]; Staff's proposed adjustment, which reflects a decrease in gas cost in the Harrisburg service area due to a revision in the Texas Eastern demand charge allocation factor, is reasonable and should be approved; *Staff's proposed adjustment is necessary to prevent Respondent's customers in the Harrisburg service area from being billed for PGA revenues in excess of the cost of gas prudently purchased*; Respondent should refund its overcollection of Texas Eastern demand charges in the amount $260,553 plus interest to its customers in the Harrisburg service area through the R4 factor of the PGA in accordance with the provisions of 83 Ill. Adm. Code 525.60;

(6) Respondent should review the Texas Eastern demand charge allocation factors at the time of each Tennessee rate case; Respondent should submit its study of such allocation factors to the Accounting Department of the [Illinois Commerce] Commission's Public Utilities Division at the same time that it is submitted for review in Tennessee." (Emphasis added.) *Kaskaskia* (Oct. 4, 1991), ___ Ill. Com-

merce Comm'n Rep. at ___ (ICC Nos. 89—0357, 89—0365 cons., slip op. at 17-18).

The Commission filed an amendatory order on October 17, 1991, that did not substantively affect its previous findings. *Illinois Commerce Comm'n v. Kaskaskia Gas Co.* (Oct. 17, 1991), ___ Ill. Commerce Comm'n Rep. ___ (ICC Nos. 89—0357, 89—0365, cons.).

## II. STANDARD OF REVIEW

An appellate court's jurisdiction of direct appeals from the Commission is governed by section 10—201 of the Act (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 10—201). The Commission's findings of fact are to be considered *prima facie* true, and the burden of proof on all issues raised by an appeal is on the party appealing the Commission's order. (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 10—201(d).) Commission decisions are "entitled to great weight as being the judgment of a tribunal appointed by law and informed by experience." (*Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523, 165 N.E.2d 329, 332.) In considering the record before it, the Commission is not required to make a finding on each evidentiary claim. (*United Cities Gas Co. v. Illinois Commerce Comm'n* (1971), 48 Ill. 2d 36, 40, 268 N.E.2d 32, 34.) Its findings need only be specific enough to permit an intelligent review of its decision. (*Illinois Central R.R. Co. v. Illinois Commerce Comm'n* (1952), 411 Ill. 526, 528, 104 N.E.2d 796, 797.) Further, an order of the Commission will not be set aside unless it is against the manifest weight of the evidence. *Rural Electric Convenience Cooperative Co. v. Illinois Commerce Comm'n* (1979), 75 Ill. 2d 142, 148, 387 N.E.2d 670, 673.

## III. ANALYSIS

■ United Cities raises 10 issues on appeal, all of which (it argues) require a reversal of the Commission orders. However, section 10—201 grants an appellate court the power to remand, reverse, or affirm, in whole or in part, an order of the Commission in only four circumstances: if (1) the Commission's order is not supported by substantial evidence on the record; (2) the Commission acted outside its authority, or lacked jurisdiction to enter the order; (3) the Commission's rule, regulation, order or decision violates the State or Federal constitution or laws; or (4) the order, or the proceedings from which it ensued, violated the State or Federal constitution or laws. See Ill. Rev. Stat. 1991, ch. 111²/₃, par. 10—201(e)(iv); see also

*Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 469, 303 N.E.2d 364, 369.

## A. *Recovery of Demand Costs*

United Cities argues that the Commission orders must be reversed because they prevent it from recovering all of its costs. United Cities argues that the demand charge is akin to an insurance premium to be paid by Illinois consumers, explaining as follows:

> "As is the case [with] coverage under insurance policies, the contract demand and the storage demand do not change over the life of the pipeline contract. Therefore, as Mr. Cline testified, contract demand services and storage demand services are established by means of long-term contracts from five to twenty-five years in length. The contracts, therefore, necessarily are future oriented. Any historical data used to develop the contract demand and storage demand must be adjusted, at the time of contract, for weather normalization, customer growth and conservation expected for the life of the contract. Otherwise, a ga tility may not secure enough gas supply to meet customers' requirements."

Cline's surrebuttal testimony referred to in this argument was as follows:

> "By way of analogy, if a person paid medical insurance premiums for a year but did not become ill, no one would argue that the person had been overcharged. The person benefitted from the security of the insurance. Likewise, the Harrisburg customers in 1988 benefitted from the security that a certain level (42%) of contract demand—[*i.e.*], *capacity*—was reserved for them. That the projected peak day demand (amount of insurance) may not have been fully called upon does not detract from the fact that the security was there for them. No one has questioned that the capacity reserved for them was not reasonably forecasted." (Emphasis added.)

Therefore, United Cities concludes that the Commission "erroneously disregarded the fact that Illinois ratepayers received the *full benefit* of 42% of the Texas Eastern contract and storage demand in 1988. Having received the benefit, the Illinois ratepayers properly were charged 42% of the cost of that demand." (Emphasis in original.)

### 1. Case Law

In *United Cities Gas Co. v. Illinois Commerce Comm'n* (1992), 225 Ill. App. 3d 771, 587 N.E.2d 581, this court ruled that a consulting and noncompetition agreement conferred a benefit to United Cities' ratepayers. Accordingly, we reversed the decision of the Commission and decided that the costs associated with that agreement were "a legitimately incurred cost of service which it [(United Cities)] is entitled to recover in its rates." (*United Cities*, 225 Ill. App. 3d at 778, 587 N.E.2d at 585.) However, in allowing United Cities to pass on this expense, United Cities was only able to bill Illinois consumers for that amount "attributable to Illinois" consumers. (See *United Cities*, 225 Ill. App. 3d at 773, 587 N.E.2d at 582.) Therefore, that *United Cities* decision is not persuasive here where the issue is *not* the legitimacy of the cost, but rather the reconciliation of costs and revenues.

An earlier decision of the Commission, referred to by these parties as the "Barnsley order" (*United Cities Gas Co.* (Nov. 19, 1990), ____ Ill. Commerce Comm'n Rep. ____ (ICC Nos. 90—0008, 90—0152 cons.)), involved United Cities' acquisition of the Barnsley gas storage field in Kentucky in 1989. United Cities proposed that the cost of acquiring the Barnsley field should be allocated 24.06% to Illinois customers and 75.94% to Tennessee customers. United Cities' manager of accounting for its regulatory affairs department testified that these allocations were based on estimated peak day usage of the Barnsley field by Illinois and Tennessee customers. (*United Cities Gas Co.* (Nov. 19, 1990), ____ Ill. Commerce Comm'n Rep. at ____ (ICC Nos. 90—0008, 90—0152 cons., slip op. at 11).) Recognizing that the statute does not specifically indicate how demand costs should be allocated (a problem that has now come to fruition in the present case), the Commission accepted the compromise position of basing allocation on the cost of capital, and not on estimated peak day demand. The Commission further held that these allocation factors were to be reviewed at the time of the Company's next Tennessee rate case. See *United Cities Gas Co.* (Nov. 19, 1990), ____ Ill. Commerce Comm'n Rep. at ____ (ICC Nos. 90—0008, 90—0152 cons., slip op. at 17).

In *Illinois Commerce Comm'n v. Iowa-Illinois Gas & Electric Co.* (1989), 105 Pub. Util. Rep. 4th 353, the Commission reviewed the collection and allocation of nuclear power plant decommissioning costs which were recovered through base rates, not the PGA clause. These costs were allocated by using a three-year average of

the noncoincident peak demand in the two States Iowa-Illinois served. The Commission decided that these costs should be recovered through a rider mechanism, and not through the PGA clause or a rate case proceeding. The Commission also accepted Iowa-Illinois' allocation method, but the decision included that the allocations would be subject to a true-up for over- or underrecovery. See *Iowa-Illinois*, 105 Pub. Util. Rep. 4th at 364.

### 2. Statutory Guidance

Section 36 of the former Act (see Ill. Rev. Stat. 1983, ch. 111⅔, par. 36), the predecessor to section 9—220, was interpreted in *Business & Professional People* (171 Ill. App. 3d at 957-58, 525 N.E.2d at 1058), wherein the appellate court said the following:

> "The language of section 36 demonstrates a grant of broad discretion to the Commission by the legislature. The Commission was authorized to investigate the feasibility of adopting uniform fuel (and gas) adjustment clauses, discretion to implement such clauses, and authority to promulgate rules and regulations therefor. *The only precise legislative directives were that the Commission hold an annual reconciliation proceeding* and that costs imposed through the UFAC [(now the PGA)] be actual, prudent, and based upon uniformly applied accounting principles.
> \* \* \*
> Thus, under both the Public Utilities Act and the Public Utilities Regulatory Policies Act of 1978, the Commission had authority to inquire into production management in determining whether fuel purchases were 'prudently' made. To conclude otherwise would result in an extremely narrow interpretation of a broad grant of statutory power and would also defy common sense. \* \* \* If, in a fuel reconciliation proceeding, the Commission could not examine the reasons that necessitated a fuel purchase, the prudence standard would have no effect on ensuring a just and reasonable rate as required by sections 36 and 41 of the Act; a utility could generate electricity in any manner it chose, efficiently or inefficiently, and the Commission would be limited to determining merely whether the utility paid a prudent price for the fuel. We do not believe that this was the intent of either our State legislature or Congress in enacting the fuel adjustment clauses legislation." (Emphasis added.)

### 3. Conclusion: Demand Costs

■ We believe that the refund ordered against United Cities is consistent with the responsibilities delegated to the Commission under section 9—220. United Cities may continue to allocate its demand charges by the same allocation methodology, but these cost recoveries are subject to a true-up under section 9—220. To rule otherwise would reject the applicability of the statute to these costs. "[W]here administration of a broad statutory standard has been delegated to an agency's discretion, courts shall rely upon the agency's interpretation where there is reasonable debate as to the statute's meaning." *Business & Professional People*, 171 Ill. App. 3d at 957, 525 N.E.2d at 1057.

We disagree with United Cities' characterization of the demand cost allocations as insurance for which the *company* contracted with Texas Eastern in order to meet its obligations to Illinois ratepayers. While Illinois ratepayers are required to pay for the security that a certain level of contract demand will be reserved for them, that does not mean that these costs are not subject to a true-up. Indeed, the very purpose of section 9—220 is to reconcile legitimate costs, such as payments United Cities made to Texas Eastern, with revenues received to cover those costs.

Oddly, despite the Commission's specific finding that United Cities "acted reasonably and prudently in its purchases of natural gas during calendar year 1988" (see *Kaskaskia* (Oct. 4, 1991), \_\_\_\_ Ill. Commerce Comm'n Rep. at \_\_\_\_ (ICC Nos. 89—0357, 89—0365 cons., slip op. at 18)), the Attorney General argues the contrary to this court. Despite this argument, we need not address the prudence of United Cities' purchases because (1) they are not relevant to a cost recovery true-up proceeding, and (2) the Commission's finding that United Cities' purchases were prudent is not against the manifest weight of the evidence.

### B. *Res Judicata*

■ United Cities argues that the "Barnsley order" establishes precedent that the Commission must follow. Although the Commission agreed with United Cities' proposed cost allocations in that docket, it also held that these allocation factors were to be recalculated at the terms of the next Tennessee rate case. (See *United Cities Gas Co.* (Nov. 19, 1990), \_\_\_\_ Ill. Commerce Comm'n Rep. at \_\_\_\_ (ICC Nos. 90—0008, 90—0152 cons., slip op. at 17).) The *Iowa-Illinois* case cited by United Cities is similarly unpersuasive in that it maintained the al-

location *method*, but did *not* address the accuracy of the allocation percentages *or* the ability of the Commission to reconcile revenues in a true-up proceeding.

Decisions of the Commission are not *res judicata*. "The concept of public regulation includes of necessity the philosophy that the commission shall have power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding." (*Mississippi River Fuel Corp. v. Illinois Commerce Comm'n* (1953), 1 Ill. 2d 509, 513, 116 N.E.2d 394, 396-97.) Thus, like other administrative agencies, the Commission is free to change its standards so long as such changes are not arbitrary and capricious. (*City of Chicago v. Illinois Commerce Comm'n* (1985), 133 Ill. App. 3d 435, 440-41, 478 N.E.2d 1369, 1373-74.) In fact, as we view this case (and as the Commission argued it), the Commission is not changing its methodology at all. Instead, the Commission is merely exercising its rights and obligations under section 9—220.

Citing to both *Mississippi River Fuel* and *Iowa-Illinois* in its conclusion, the Commission order stated the following regarding the "Barnsley order":

"The Commission's adoption of an allocation method in the Barnsley Order is based on the facts and circumstances in that docket. ***

\* \* \*

The evidence in this proceeding does not establish that there has been any double recovery of pipeline demand charges through the use of Respondent's allocation factors. Furthermore, the evidence does not indicate that Respondent recovered more than 58% of the Texas Eastern contract and storage demand charges from its Tennessee service area in 1988. ***

\*\*\* There is no evidence, however, that the increased sales resulted in overcollection of the demand charges in Tennessee.

\*\*\* *We distinguish the lack of any evidence of overcollection by Respondent of its total Texas Eastern demand charges from the overcollection by Respondent of Illinois ratepayers' share of those demand charges.*

\*\*\* This evidence, which was not relevant in the Barnsley case, represents a change in circumstances that justifies departure from the allocation methodology adopted in that Order." (Emphasis added.) (*Kaskaskia* (Oct. 4, 1991), ____ Ill. Commerce Comm'n Rep. at ____ (ICC Nos. 89—0357, 89—0365 cons., slip op. at 14-16).)

Despite the last part of this order, we do not agree that there has been a change in allocation methodologies; rather, it is merely a true-up of expenses. United Cities argued that if it had recalculated its peak day demand estimates in 1988, the allocation factors would still have been the same. We do not see this as a matter of contention. As stated before, the allocation methodology adopted by United Cities in this docket and the Barnsley docket may still be used; however, as in the Barnsley docket, the costs recovered from Illinois customers are still subject to reconciliation under section 9—220.

### C. *Multijurisdictional Nature of United Cities*

■ United Cities argues that because it must deal with two different jurisdictional methods of cost reconciliation, the Commission's order will deprive it of its statutory right to recover costs. Specifically, United Cities alleges that the Commission's order illegally "traps" the demand costs incurred by it, in violation of the Federal "filed rate" doctrine. The United States Supreme Court defined this doctrine as follows:

> "[T]he 'filed rate' doctrine *** holds that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates. ***

> *** The filed rate doctrine ensures that sellers of wholesale power governed by FERC can recover the costs incurred by their payment of just and reasonable FERC-set rates. When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate. [Citation.] Such a 'trapping' of costs is prohibited." *Nantahala Power & Light Co. v. Thornburg* (1986), 476 U.S. 953, 962-70, 90 L. Ed. 2d 943, 951-56, 106 S. Ct. 2349, 2354-59.

■ There are two problems with this argument. First, United Cities has failed to carry its burden of proving that underrecovery of costs cannot be obtained in prospective rate increases to its Tennessee customers. (See *Stro-Wold Farms v. Finnell* (1991), 211 Ill. App. 3d 113, 118, 569 N.E.2d 1156, 1159 ("[P]laintiffs suggested that law other than Illinois law might apply, but did not state what that other law was"); see also *O'Brien v. Rautenbush* (1956), 10 Ill. 2d 167, 169, 139 N.E.2d 222, 224 ("When a litigant relies upon the laws of another State as the basis for his claim, he must plead and prove such laws,

for the broad rule prevails that, in the absence of a showing to the contrary, such laws will be presumed to be the same as the laws of the forum").) While Bobby Cline testified that the Tennessee demand charge allocations cannot be changed until the next rate case, no evidence reveals whether Tennessee would allow recovery of these costs after our decision in this case. Second, Illinois is not violating the filed rate doctrine. Section 9—220 and this decision do not deny United Cities recovery of FERC-set rates. (Indeed, one could argue that Tennessee is violating the filed rate doctrine for not allowing for adjustments in costs and revenues.) However Tennessee decides to govern utilities is of no moment for Illinois courts or the Commission when applying Illinois statutes.

### D. *Interest Due on Refund*

■ United Cities argues that the Commission's order to refund the $260,553 plus interest is erroneous. The Commission order on this point reads as follows:

> "United Cities Gas Company shall refund the amount of $260,553 plus interest to its customers in the Harrisburg service area through the R4 factor of its PGA in accordance with the provisions of 83 Ill. Adm. Code 525.60." (*Kaskaskia* (Oct. 4, 1991), ____ Ill. Commerce Comm'n Rep. at ____ (ICC Nos. 89—0357, 89—0365 cons., slip op. at 18).)

United Cities' argument on appeal suggests a misreading of the Commission's order, interpreting the order as requiring a refund plus interest, as if there were interest on a judgment. We agree with the Attorney General, and read the order as directing the refund to be applied through the PGA clause as set forth in section 525.60 of title 83 of the Illinois Administrative Code (see 83 Ill. Adm. Code §525.60 (1991)) with interest to be applied consistent with the formula contained in that section.

### IV. CONCLUSION

For the reasons set forth above, the decision of the Commission is affirmed.

Affirmed.

KNECHT, J., concurs.

JUSTICE LUND, dissenting upon denial of rehearing:
This dissent follows United Cities' petition for rehearing. My apol-

ogies to the esteemed members of this panel who continue to partici-pate in the majority opinion. I do not intend to repeat the history of the proceedings as set forth so well in the majority opinion. I do not apologize to counsel for my belated dissent. As appellate judges, we are compelled to consider various subject matter in both criminal and civil cases. Utility law is a very specialized field, and we find our-selves relying upon the experts in that field who practice before us. It appears to me that, in rate regulation cases, the art of simplicity is nonexistent. With this preface, I warn the readers of this dissent that I wrote this as simply as I could, in hopes that even I can understand what this case is about. As a result, some of the terminology is mine.

We are concerned with allocation of "demand costs" between Illi-nois and Tennessee gas customers of United Cities. "Demand costs," for purpose of this dissent, are costs incurred by United Cities over and above the normal unit of gas cost purchased by utilities.

In the present case, the "demand costs" were divided between Il-linois customers and Tennessee customers, based upon an earlier *pro rata* use history. The *pro rata* expense allocation of demand costs was used in prior Illinois and Tennessee Commissions rate determinations. The present dispute arises as a result of a 1991 Commission determi-nation that the Harrisburg, Illinois, "demand cost" allocations for 1988 and subsequent years must be based upon up-to-date actual use by Illinois and Tennessee customers. The current actual use evidence indicates that, since the original allocation compilation, Tennessee us-ers' percentage of total use has increased.

Problems arise because both Tennessee and Illinois utility regula-tors, separately, determine the rate United Cities can charge, and Illi-nois cannot require Tennessee to allow retroactive recovery for United Cities. The Commission has provided for a retroactive alloca-tion of "demand cost," providing for a smaller percentage of the "de-mand cost" expense be paid by the Illinois customers.

Without concurrent action by the Tennessee regulatory commis-sion reflecting retroactive charges (surcharges) to Tennessee cus-tomers, United Cities will not recover all of the "demand cost" ex-pense.

There is a strong temptation to say United Cities was in the best position to know of any unfair allocation costs and should stand the loss. United Cities was doing the customer billing for actual use and, in today's computer-oriented world, the use by Tennessee customers and Harrisburg, Illinois, customers should be easily ascertainable. Per-haps the monkey should be on United Cities' back for not petitioning earlier for allocation adjustments before both regulatory commissions.

This position sounds simple but, for reasons I will not discuss here, it is not.

After further consideration of this case, I conclude the Commission indulged in retroactive rate adjustment. The 1988 United Cities rates included an allocation of 42% of the "demand cost" to the Harrisburg customers. The rate billed was consistent with orders of the Commission. The Commission is now ordering United Cities to refund, based upon an allocation of 28% of the "demand costs" to Illinois users. Once established, a rate is effective unless stayed pending review, and refunds are not allowed because the rate is too high, nor are surcharges allowed because the rate is too low. This rule introduces stability. *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 207, 529 N.E.2d 510, 515-16.

If the rule set forth in *Citizens* has been adopted in Tennessee, odds are that the loss to United Cities resulting from the Commission order will not be offset by surcharges in Tennessee.

As a result of my conclusion of retroactive rate making, I now dissent from the majority opinion.